JAMES COFFEE, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. When a person charged with crime is brought before a Justice of the Peace or other officer for preliminary examination, it is the duty of the officer to caution the accused that any statement or confession he may make may be used against him, and to inform him of his rights in the premises.

2. Before the confessions of a party charged with crime are admissible in evidence against him, it must be clearly shown that such confessions were free and voluntary, and the confessions of the accused should be acted upon by courts and juries with *great caution.*

3. When a confession has been obtained through illegal influences, such influences will be presumed to continue and color all subsequent confessions unless the contrary is *clearly shown.*

4. The defendant was in the custody of a guard, (who were armed) charged with the murder of one Hammond, a rope was placed around his neck by the guard, who took him from where an inquest was being held over the remains supposed to be Hammond's, carried to the woods not far off, the end of the rope thrown over a limb, and the defendant was then told that his last hour had come, that he had to tell all about the crime with which he was charged; the accused denied all knowledge of the crime; the guard then tightened on the rope; let the accused down, and he again denied all knowledge of the crime; the rope was again

502 SUPREME COURT.

Coffee vs. State of Florida—Opinion of Court.

tightened, and the prisoner then said if they would give him two minutes he would tell all he knew, and he then confessed that he was guilty, and the guard forced him to promise that he would "stick" to what he then said, and that he would *stick to it in court.* The guard then carried the prisoner before the inquest, where there was great excitement and talk of lynching, and he again confessed; the next day he was carried before a Justice of the Peace for preliminary examination, and there in the presence of two of the guards whom he had promised to stick to what he first said, without counsel, without any caution by the Justice, without being informed as to his rights, he again confessed: *Held,* That it is not clearly shown that the confession at the preliminary examination was not made under the influences that induced the previous confessions.

Writ of error to the Circuit Court for Marion county.

The facts of the case are stated in the opinion of the court.

*O. T. Green* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

MITCHELL, J.: The plaintiff in error was jointly indicted with Paul Barco and Holmes Jacobs for the murder of Henry B. Hammond, and the case was tried at a special term of the Circuit Court of Marion county, in the month of January, 1889. A severance was granted and the plaintiff in error alone was tried.

The issues were submitted to a jury, who convicted Coffee of murder in the first degree, and the sentence of death was passed upon him, and he now brings his case before this court on a writ of error, and assigns the following errors:

1st. The court erred in allowing the confession of the plaintiff in error, made at Martel, Fla., to go to the jury against the objection of the plaintiff in error, it being evi-

JUNE TERM, 1889. · 503.

Coffee vs. State of Florida—Opinion of Court.

dent that said confession was not voluntary, having been induced by fear or the hope of favor.

2d. The court erred in overruling the motion of the plaintiff in error to exclude the confessions of the plaintiff in error from the jury, it being evident it was not voluntary, and there being no evidence to remove the presumption that the influences inducing the first two confessions continued.

3d. The court erred in overruling the plaintiff in error's motion for a new trial. The 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th and 9th grounds in said motion are not insisted on.

The evidence set up in the transcript of the record tends to show that on the 13th day of June, 1888, a difficulty occurred between the plaintiff in error, Coffee, and Henry B. Hammond, at Cotton Plant, in Marion county. The difficulty occurred about a small sum of money which Coffee claimed Hammond owed him. Coffee demanded the amount of Hammond, who refused to pay it, saying that he was entitled to a credit of thirty cents; angry words ensued, each of the parties cursing the other, when they clinched and fell upon the ground, when Coffee struck Hammond several times with the handle or staff of a buggy whip; some other party interfered and the parties engaged in the fight were separated, and Hammond, who was on the bottom in the fight, after getting up seized a piece of board, when Coffee hurriedly left, going in the direction of his home, saying at the time, either that he had given Hammond h—l, or that he would give him h—l; that Hammond was at the time clerking for one Fant, at Cotton Plant, and that he slept in a back room of the store where he was clerking; that some time from one to three o'clock on the morning after the difficulty between Coffee and Hammond, Fant's store was discovered to be on fire; that it had nearly burned down at daylight when the first persons

visited the place; that there were in the ruins of the store —the back part or shed room where Hammond slept—the charred remains of a human being, so disfigured that none of the witnesses were able to recognize them; the skull was whole with the exception of a hole in the front which one of the witnesses says was burned; some ten feet from where the remains were found, in searching in the fire, some one found the watch and chain usually worn by Hammond, both of which were smoked and the watch partly melted, the hands of which showed that it ceased to run at three o'clock. That owing to the difficulty between Coffee and Hammond on the previous day suspicion attached to Coffee, and parties set out to arrest him, and they found him concealed in the loft of a house; he was arrested and carried to Cotton Plant, where the store was burnt, and where there was an inquest being held by the Coroner and jury, over the remains found at the store. The inquest was not closed that day, but adjourned to the next, and the prisoner was kept under guard. The inquest convened at about eight o'clock the next morning and proceeded with the investigation, and during the time the investigation was going on, the guard (four men) who had the prisoner in charge, put a rope with a slip noose around his neck and carried him to the woods, about one-fourth of a mile from where the inquest was being held, when they threw the other end of the rope which was around the neck of the prisoner, over a limb and told him, the prisoner, to tell what he knew about the crime with which he was charged, he said he knew nothing, when the guard tightened on the rope, and then asked the prisoner if he would tell what he knew about the killng of Hammond and the burning of the store, but he again said that he knew nothing, when the rope was again tightened, and the prisoner then said if they would give him two minutes he would tell all that he

JUNE TERM, 1889.                505

Coffee vs. State of Florida—Opinion of Court.

knew about it; the guard told him to tell the truth and to
stick to it; that he had to stick to what he then said, and
that he *had to stick to it in court*, which the prisoner prom-
ised to do.    There was also some evidence tending to show
that there were threats made by the guard, all of whom
were armed with Winchester rifles or double-barreled shot
guns, that if the prisoner did not tell the truth, the whole
truth, and nothing but the truth, and stick to it, he would
be killed.    That after the prisoner agreed to confess the
guard carried him back to where the inquisition was being
held, and informed the jury, or the magistrate, who was
acting as Coroner, that the prisoner was ready to confess;
that the prisoner looked like he had passed a sleepless
night; that the jury took a recess for the purpose of allow-
ing the prisoner time to reflect and to take some refresh-
ments; that after partaking of watermelons as refresh-
ments, the prisoner was taken before the jury, and then and
there made his statement, confessing his complicity in the
killing of Hammond and the burning of Fant's store; that
there was great excitement among the large crowd of peo-
ple who had assembled at the place at the time; that a gun
had been fired by a party who shot himself through his toe,
and that there had been talk of lynching the perpetrators
of the supposed murder; that in this first confession the
prisoner stated that McCullough had killed Hammond,
and that he and Bostock were present aiding and assisting
McCullough.    After this statement the inquest was ad-
journed for the purpose of giving time to arrest Bostock
and McCullough; that they were arrested, and the Coron-
er's jury being assembled, the prisoner *was required* to repeat
his statement in the presence of Bostock and McCullough,
which he did repeat.    That on the night of the second day
of the proceedings, the defendant with the other parties
whom he had implicated in his confession, Bostock and

McCullough, were taken to jail at Ocala, and that on the
following day the prisoners were taken to Martel, about
three and a half miles from Cotton Plant, where the Coron-
er's inquest was held, for a preliminary hearing before H.
H. Hudgens, a Justice of the Peace, *and who had acted as
Coroner at the inquest;* that before he made his confession
at Martel the prisoner was cautioned by Mr. Long that any
statement he made would be used against him; and that
he, the prisoner, was assured by Mr. Long and Mr. Harri-
son that he would be protected in any statement he might
make; that the law and the citizens would protect him;
that he, Harrison, relied upon his influence in the commu-
nity to protect the prisoner, but he admitted on cross
that he could not protect him. That the prisoner was not
represented by counsel at either Cotton Plant or Martel;
that two of the guards who had extorted the confession
from the prisoner at Cotton Plant were present when he
made his confession at Martel; that Hudgens, Justice of
the Peace, who acted as Coroner at Cotton Plant, and who
held the preliminary examination at Martel, never at any
time cautioned the prisoner that any confession or state-
ment he might make would be used against him, nor did
he in any manner inform the prisoner of his rights in the
premises, or afford the prisoner any protection whatever,
or offer to afford him such protection.

There was much more evidence in the case, but the fore-
going is the substance of the whole, and it is not in any
material point, changed by any other part thereof, and it is
sufficient, we think, to give a clear idea of the facts of the
case.

At the trial of the cause the State offered in evidence the
several confessions made by the plaintiff in error, to the
introduction of which plaintiff in error objected; the court
admitted in evidence the confessions made at Martel, but

excluded those made at Cotton Plant, to which the plaintiff in error duly excepted.

The following is the confession admitted in evidence, upon the evidence of H. W. Long, a witness for the State, and who had assisted in conducting the case against the prisoner at both the coroner's inquest and the preliminary examination, which evidence is corroborated by other witnesses:

" The defendant in substance stated at Martel that after the difficulty between him and Hammond, which occurred at Cotton Plant, near Mr. Mann's store, that he left for his home and stopped where two men by the name of McCullough and Bostock were drawing boards; that he communicated to them the difficulty he had had with Hammond. One of them, I think McCullough, stated to him that he had a grudge against Hammond, and they had better put him out of the way, giving as a reason, that in case Hammond was permitted to live, that he and his friends would take the life of Coffee; that they then and there made up and agreed that they would meet at Coffee's house—these two men, McCullough and Bostock, would meet at Coffee's house during that night, and that they would from there proceed to Fant's store and murder Hammond; that about one o'clock he, or one of them (my recollection is) whistled (I am not positive as to the precise hour) which he recognized as a signal for him to join them; that he did so; that one of them (I forget which, McCullough or Bostock,) had a quart bottle of kerosene oil, and the other a pistol, and that he, Coffee, had a pocket knife; that on their way to the store he, Coffee, suggested that they must not shoot Hammond, there being houses in close proximity to the store where Hammond slept; that the firing of the pistol would arouse the inmates of the houses. They then agreed that the man having the kerosene oil was to saturate the front of the store with the oil and apply

fire to it by the use of matches; that the other two were to take their stand at or near the door entering Hammond's bed room; that the fire was so applied; that Hammond did not wake until the roof of the front of the store was falling in. They heard him then get out of the bed and he moved his trunk to the door, opened it, and in a leaning position was in the act of shoving the trunk out, when the man having the pistol in his hand struck, he had the muzzle of the pistol in his hand, and struck Hammond with the hammer of the pistol on the forehead. Hammond hollowed " Oh Lord," fell to the floor, arose retreating, falling as he went and rising. As he entered the cotton room adjacent to his bed room, he fell upon his face; that the party who had accosted him went into where he was and discovered that he was dead; that one of the parties then went into the store and got a match box, I think, that was used as a money drawer to deposit money in, brought out what money there was, amounting to a small amount, five or six dollars, I think, I don't remember exactly the amount. They concluded they heard some person and ran in a southeasterly direction, crossing the railroad east of the store several hundred yards, and went to a log where, on the way to the store, they had pulled off their shoes, or some of them had. The proposal was then made to divide the money. The two that had not done the killing told the man that had to keep the money himself. They afterwards separated and went to their respective houses. That is the substance that I remember. While Coffee took no part in the matter, he was there for the purpose of aiding and abetting."

Upon cross this witness stated some additional minor details, which did not change the foregoing statements of the witness in any material point. Other witnesses testified to the confession, but none of them stated any fact materially

differing from the facts as testified to by Mr. Long.　To
show the circumstances under which the prisoner was in-
duced to make the first confession, we give the evidence of
James S. Mann, one of the guards, who, after detailing the
arrest, says : " He was then put in an old house and
guarded that night.　On the second day he (the prisoner)
was carried back to where the inquest was going on all
day, about 8 or 9 o'clock.　That was next morning.　Nothing
was done to him before he was carried back to the inquest.
After I handed him over to the guard I saw him.　I was
around there with him.　He was first in charge of one and
then another.　Gurky had him first.　I don't know who I
turned him over to first at that time.　I was right there
all the time.　I was not there exactly all the time—very
near all the time.　Question : Was the defendant there
all the time ?　No, he was not.　He was a quarter of a mile
from the ground—south of the ground in the woods.　I
was with him all that time for one, and James Radcliffe
Gurky and John Parker.　I was armed.　Yes, a rope was
put around his neck ; he was not pulled up to a tree ; the
rope was put over a limb, but it was not pulled up.　He
was told to tell the truth, and nothing but the truth, and
that he had to stick to it.　He was asked by one of the
party, after he made the confession, would he stick to it in
the court, and he said he would.　The rope was tightened
a very little.　The rope was loosened on the defendant when
he confessed.　The defendant denied all knowledge of the
crime before the rope was tightened.　I think that he was
told that that was the last hour, and that he must tell all
that he knew about it.　He said he knew nothing at all
about it.　No, he was not told he was given two and a half
minutes to confess.　He said himself that he would tell
everything if we would give him two minutes.　He was
not asked whether George Bostock and Adam McCul-

lough together with him did the thing. I think the rope was tightened on him twice. I could not tell you how tight the rope was pulled. I didn't have hold of it, not very tight, I don't think. I am positive he was not lifted off the ground. I think he raised himself on his toes to keep the rope. from tightening on his neck. The first time the rope was tightened on him he said he would tell the truth, and we were not satisfied with what he told. He only brought in two other parties, and claimed to be out himself. A question was put to him how he knew about them, and the rope was tightened on him the second time, and he made a full confession. Question: How long a time elapsed after he was pulled up to the tree before coroner's inquest? Not long, about a half hour. (We presume that the meaning of this is, how long after the confession before defendant was carried before the jury of inquest.)

The first two errors assigned may be considered together as they raise but one and the same question, to-wit : did the court below err in admitting in evidence the confession made by plaintiff in error at Martel ?

The Martel examination was a judicial examination, and it was the duty of the Justice of the Peace holding the same to caution the prisoner, to put him on his guard, and to inform him as to his rights in the premises. Heard's Criminal Law, 192, and cases cited ; 3 Russell on Crimes, 9th Edition, 378.

Before the confessions of a party charged with crime are admissible in evidence against him, it must be shown that such confession was freely and voluntarily made. Simon vs. State, 5 Fla., 285; Dixon vs. State, 13 Fla., 336 ; Metzger vs. State, 18 Fla., 481 ; Flanagan vs. State, 25 Ark., 92 ; State vs. Staley, 14 Minn., 105 ; Cardy vs. State, 44 Miss., 332 ; State vs. Lowhorne, 66 N. C., 638 ; O'Brian

vs. People, 48 Barb., 274; Vaughn, vs. Commonwealth, 17 Gray, 576; Price vs. State, 8 O. St., 418; Mose vs. State, 36 Ala., 211; Aaron vs. State, 37 Ala., 106; Joe vs. State, 38 Ala., 422; Dinah vs. State, 39 Ala., 359; Miller vs. State, 40 Ala., 64; Love vs. State, 22 Ark., 336; People vs. Jim Ti, 32 Cal., 60; Miller vs. People, 39 Ill., 457; Anstine vs. State, 51 Ill., 236; State vs. Ostrender, 18 Iowa, 435; Frank vs. State, 39 Miss., 705; State vs. Brockman, 46., 566; Frain vs. State, 40 Ga., 539; State vs. Howard, 17 N. H., 171; People vs. Phillips, 42 N. Y., 200; State vs. Squires, 48 N. H., 364; Commonwealth vs. Tuckerman, 10 Gray, 173; Commonwealth vs. Whittemore, 11. Gray, 201; State vs. Walker, 34 Vt., 296; State vs. Carr, 37 Vt., 191; Thompson vs. Commonwealth, 20 Grat., 724.

It is a rule of law that the confessions of parties charged with crime should be acted upon by courts and juries *with great caution*. 1 Greenleaf on Evidence, section 200; Best on Evidence, top p. 537; Deathridge vs. State, 1 Sneed, 75; People vs. Johnson, 41 Cal., 452; Simon vs. State, 5 Fla., 285; Dixon vs. State, 13 Fla.; 636; Metzger vs. State, 18 Fla., 481; People vs. Rulloff, 3 Parker C. R., 438.

The wisdom of this rule cannot be questioned, for the reason that notwithstanding the confessions of persons accused of crime have been held to be evidence of the very highest character, upon the theory that no man would acknowledge that he had committed a grave crime unless he was actually guilty, but experience teaches that this theory is a fallacy, for it is a fact that numbers of persons have confessed that they were guilty of the most heinous crimes, for which they suffered the most horrible punishments, and yet they were innocent.

In the sixteenth and seventeenth centuries, in enlightened England, men and women confessed that they were guilty of witchcraft—communion with evils spirits and

suffered at the stake therefor, and at this day men through fear of personal punishment, or through hope of averting such punishment, confess that they are guilty of crime, without the slightest foundation in truth for such confession, and for these reasons we say, that the theory that men will not confess to the commission of crimes of which they are innocent, is a fallacy.

There is another rule of law, and it has its foundation in *justice*, and that is, that when a confession has, in the first place, been made under illegal influences, such influences will be presumed to continue and color all subsequent confessions, unless the contrary is *clearly shown*. Simon vs. State, 5 Fla., 285 ; Love vs. State, 22 Ark., 336 ; 2 E. P. C., 658 ; Roscoe's Criminal Evidence, 40 ; Peter vs. State, 4 S. & M., (Miss.), 37 ; Joe vs. State, 38 Ala., 422 ; Dinah vs. State, 39 Ala., 359 : Ward vs. State, 50 Ala., 120 ; Redd vs. State, 69 Ala., 255 ; People vs. Jim Ti, 32 Cal., 6( ; People vs. Johnson, 41 Cal., 452 ; Austine vs. State, 51 Ill.,236 ; Commonwealth vs. Cullen, 111 Mass.,435 ; Brockman vs. State, 46 Mo., 566 ; State vs. Jones, 54 Mo., 478 ; State vs. Howard, 17 N. H., 171 ; Deathridge vs. State, 1 Sneed, 75 ; Brown vs. State, 36 Texas, 356 ; Thompson vs. Commonwealth, 20 Grat., 724 ; Best on Evidence, 537 ; Heard's Criminal Law, 189, and cases cited ; 2 Russell on Crimes, 832 ; 2 Starkey on Evidence, 49 ; Wharton's Criminal Evidence, 677.

And now, applying the evidence in the case to the principles of law laid down *supra*, was the confession made by the plaintiff in error at Martel, under the circumstances it was made, proper legal evidence to go to the jury? If so the court below committed no error in admitting said Martel confession. But, on the other hand, if the Martel confession was not made under such circumstances as to *most clearly show* (and it was incumbent on the State to

show that fact,) that said confession was *voluntarily* made, uninfluenced by the circumstances that induced the prisoner to make his former confessions, then said confessions was not legal evidence, and the court erred in admitting it. Does the evidence *clearly* show that the Martel confession was freely and voluntarily made ? Do the facts and circumstances of the case show this fact ? But the day before, the prisoner, who was accused of a most atrocious crime, was taken by the guard under whose protection he should have been, from the very presence of the officers of the law, including the Justice of Peace, carried to the woods near by with a rope around his neck, and then swung up to a limb, and before the muzzles of shot guns and Winchester rifles, and being told it was his last hour, was forced to confess that he was guilty of the crime with which he was charged ; forced to promise that he would stick to the confession he made, and forced to promise that he would stick to what he then confessed, *in court.* The prisoner was then carried before the coroner's jury, presided over by Hudgens, a Justice of the Peace, and then, with all the excitement and threats of lynching by which he was surrounded, and in the presence of the guards to whom he had confessed, and whom he had promised to stick to his first confession in court; without counsel, and without a word of caution from the Justice of the Peace; without being by said justice informed as to any rights he had, the prisoner again confessed, and in this confession he implicated Bostock and McCullough, who were brought before the jury and the prisoner was then, as Mr. Long swears, *required* to make the same statement in the presence of Bostock and McCullough, and he again confessed. Carried the following day before the same justice, at Martel, for preliminary examination, the prisoner again confessed. But under what circumstances did he confess ? Without counsel ; in the pres-

ence of two of the guard who had in the first instance extorted the confession from him ; without a word of warning or caution from the justice, and without any assurances of protection by the justice in case he confessed, or declined to confess, was this Martel confession made.

Now, it is true that both Mr. Long and Mr. Harrison, in their evidence, say that they cautioned the prisoner that anything he might say would be used against him, and that they promised to protect him. But who were they to thus caution the prisoner and to promise him protection, and in the light of what had actually occurred to the prisoner on the previous day, in the very presence of these gentlemen, what confidence could the prisoner have in such promises, though ever so honestly made? Mr. Long was acting as prosecuting officer for the State at the time, and endeavoring to fix the crime on the prisoner, and Mr. Harrison held no official position whatever to which the prisoner could hope to look for protection. Take all the evidence in regard to said confession into consideration, and we are not satisfied that the same influences which induced the first confession, did not operate upon and control the prisoner in his last or Martel confession.

It is contended that the court below, in the exercise of its sound discretion, admitted the confession, and that this court precluded from questioning such discretion. As a rule, the discretion given to the Circuit Courts is conclusive, but there are exceptions to this rule, and when it is shown that the Circuit Court has transcended its discretion, and that a wrong may have been done thereby, this court will control such discretion. Blige vs. State, 20 Fla., 742.

There is another part of the evidence in this case, and the charge of the court in reference thereto, that strikes us as being very peculiar, that is, that the plaintiff in error confessed that he, Bostock and McCullough killed Ham-

mond, whereas he, Paul Barco and Holmes Jacobs were to-
gether indicted for said offence, and at the trial the confes-
sion made by the plaintiff in error, that he, Bostock and Mc-
Cullough were the guilty parties, was admitted to show that
he, with Barco and Jacobs had committed the offence.
Before a man is put on trial he has the right to be put on
notice as to the crime with which he is charged. But in
this instance what was the notice to the accused ? Was it
that he, Jacobs and Barco, killed Hammond, or that he,
Bostock and McCullough killed him?

After the repeated confessions of the accused the State
seemed to have adopted the theory that Coffee, Bostock
ane McCullough were the parties who kill Hammond, and
they were committed on the charge, but before the trial
this theory was abandoned, and Coffee, Jacobs and Barco
were indicted for the offence. During the trial the second
theory adopted by the State was abandoned and the first
again taken up, and evidence—Coffee's confession—was in-
troduced in support of this, the first theory. Upon this
state of the case the court charged the jury : " That in
cases of capital felonies, all parties who are present aiding
and abetting at the time of the commission of the felony, are
principals, and upon the trial of one of the parties accused
it is not necessary for his conviction that it should be shown
that the party on trial himself inflicted the fatal wound,
but it is sufficient if it be proved that he was present at the
time of the commission of the felony aiding and abetting."
This is a sound legal proposition, but how does it apply to
the case at bar ? If the plaintiff in error had been indicted
with Bostock and McCullough, and his confession had been
legal evidence, then there would have been something to
base such a charge upon, but under the indictment upon
which he was tried, there is not a particle of evidence to

33

connect either Barco or Jacobs with the death of Hammond. Under this charge who are the parties supposed to be present, aiding and abetting the murder of Hammond, and whom was the party aided and abetted? Under the indictment Bostock and McCullough could not have been aiding and abetting Coffee, nor could Coffee have been present aiding and abetting Bostock and McCullough, or either of them, because the indictment charges no such offence. And, under this state of facts, what charge was the plaintiff in error called upon to meet? If he and Bostock and McCullough killed Hammond, that was an offence, but if he and Barco and Jacobs killed Hammond, that was another and a distinct offence, or in other words, it was an offence committed by other parties. When a man is put on trial, he is entitled to a plain statement of the offence with which he is charged, and at his trial the evidence is to be confined to the offence with which he is charged, but in the case at bar the evidence was not confined to the charge; it was irrelevant, and it was improperly admitted, and the charge of the court, under the circumstances, was improper.

The third assignment of error, that is, that the verdict of the jury was against the evidence, is, we think, well taken, because, under the view we have taken of the case, there was not legal evidence before the jury to sustain a conviction.

The judgment of the court below is reversed, and the cause is remanded with directions for further proceedings not inconsistent with this opinion.