DUKE THOMAS, ALIAS DUKE THOMPSON, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

1. An indictment for murder sufficiently charges that the defendant struck and killed the deceased with the weapons described, when it charges that the defendant did inflict several mortal wounds in and upon the head of the deceased by striking him in and upon his head with certain named and described deadly weapons that the defendant then and there held in his hands, &c., and that the deceased died of these mortal wounds so inflicted.

2. The form of an indictment for murder in the first degree to be found in Daniels v. State, 52 Fla. 18, 41 South. Rep. 609, is approved.

3. The ground of a motion in arrest of judgment that one J. N. Byrd signed the indictment as foreman, when in fact J. W. Byrd was foreman of the grand jury is not sustained where the record and the original indictment show the endorsement to be "a true bill, J. W. Byrd, Foreman."

4. Whether the failure to comply with the provision of the statute that indictments shall be endorsed on the back by the foreman of the grand jury, when so found, "a true bill," is waived unless made before pleading, *semble*.

5. The settled rule in this court is that in pleas in abatement setting up simply irregularities in the selection of jurors, the greatest accuracy and precision in pleading are required, and such pleas must be certain to every intent. They must leave nothing to be supplied by intendment, and no supposable special answer unobviated.

6. If, after the introduction of a confession, it appear by the subsequent testimony of the defendant that such confession was not free and voluntary, the court should arrest the examination and withdraw the evidence of such confession from the jury.

7. In considering whether the confession is voluntary, the trial judge must determine the facts even upon conflicting evidence, and the appellate court, when called upon to review his ruling upon such evidence, must accord to his finding the presumption that it is correct.

8. What circumstances constitute improper influences such as will exclude confessions are questions of law which may be reviewed by an appellate court, but the credibility of the evidence to prove the circumstances, as well as the credibility of conflicting evidence, are questions for the trial court, not reviewable by the appellate court unless the court below has clearly erred in its conclusions of facts.

9. The existence of a premeditated design to effect death may be proved by circumstantial evidence.

10. Evidence considered and found sufficient to support a verdict of guilty of murder in the first degree.

This case was decided by the court En Banc.

Writ of Error to the Circuit Court for Jackson County.

The facts in the case are stated in the opinion of the court.

*Milton Pledger* and *T. E. Wilson,* for Plaintiff in Error;

*Park Trammell,* Attorney General, for the State.

PARKHILL, J.—The plaintiff in error was convicted of the murder in the first degree of one C. W. Wilson, and sentenced to be hung.

Upon writ of error it is contended that the indictment is indefinite, uncertain and insufficient because it does not affirmatively allege that the defendant *did strike* the deceased. The indictment sufficiently charges that the defendant struck and killed the deceased with the weapons described. It charges that the defendant, the plaintiff in error here, did inflict several mortal wounds in and upon the head of the deceased by striking him in and upon his head with certain named and described deadly weapons that the defendant then and there held in his hands, &c., and that the deceased died of these mortal wounds so inflicted.

A form of an indictment for murder in the first degree passed upon and approved in this respect will be found set out in full in Daniels v. State, 52 Fla. 18, 41. South. Rep. 609. The form to be found in Section 520, Bishop's Directions and Forms may be studied with advantage.

After the trial and conviction of the defendant upon a plea of not guilty, he moved the court to arrest the judgment, among other reasons, "Because the indictment upon which the defendant was convicted is not a true bill returned by the foreman of the grand Jury of this court at the Spring term thereof, A. D., 1909."

The defendant contends in support of this ground of the

motion in arrest, "It appears that one J. N. Byrd signed the indictment as foreman, whereas J. W. Byrd was foreman of the grand jury, consequently the indictment was not signed by the foreman of the grand jury as required under Section 3960 of the General Statutes of Florida." This contention is not sustained either by the transcript of the record or by the indorsement on the original indictment which was sent here by special order of the trial judge. As evidenced to us, the indictment is indorsed: "A true Bill, J. W. Byrd, Foreman." It has been held that the failure to comply with the provision of the statute that indictments shall be indorsed on the back by the foreman of the grand jury, when so found, "a true bill," is waived unless made before pleading. State v. Agnew, 52 Ark, 275, 12 S. W. Rep. 563; Patterson v. Commonwealth, 99 Ky. 610, 5 S. W. Rep. 765. See also McFall v. State, 73 Ark. 327, 84 S. W. Rep. 479; Frances v. State, 6 Fla. 306.

The third assignment of error relates to the ruling of the court upon the demurrer to the plea in abatement.

The defendant filed a plea in abatement, as follows: "Now comes the defendant, by his attorney, and for plea in abatement to the indictment against him herein, says: That the grand jury returning said indictment was not lawfully selected and empanelled as grand jurors in this: that there was thirty-two persons, who answered to their names, as summoned on the general venire returnable on the first day of this term, and that it appears from the record of this court that the grand jury was selected from only twenty-eight of the names of said persons so summoned on said general venire, wherefore the defendant prays an abatement of said action.

Milton Pledger,<br>Thos. E. Walker, Attys for Defendant."

The settled rule in this court is that in pleas in abatement setting up simply irregularities in the selection of jurors the greatest accuracy and precision in pleading are required, and such pleas must be certain to every intent. They must leave nothing to be supplied by intendment, and no supposable special answer unobviated. Ford v. State, 44 Fla. 421, 33 South. Rep. 301; Colson v. State, 51 Fla. 19, 40 South. Rep. 183; Taylor v. State, 49 Fla. 69, 38 South. Rep. 380.

Section 1575 General Statutes of 1906, provides that at every regular or special term of the circuit court the judge thereof shall proceed to draw from the box the names of thirty-six (36) persons to serve as jurors at the next succeeding term of said court; and that on the opening day of such succeeding term, or as soon thereafter as practicable, it shall be the duty of the judge to place the names of thirty-six (36) persons so summoned, or of so many of them as may appear in response to the summons, in a box, and draw therefrom the names of eighteen (18) persons who shall serve as grand jurors for the term.

Other provisions of the General Statutes exempt from jury duty persons who are over a certain age, or who occupy certain positions or follow certain occupations. By statute, too, certain persons are disqualified as jurors by conviction of certain crimes, or by holding certain official positions and by mental infirmity. Section 3859 General Statutes provides that any person held to answer to any criminal charge may object to the competency of any one summoned to serve as a grand juror before he is sworn, on the ground that he is a prosecutor or complainant upon any charge against such person, or that he is a witness on the part of the prosecution and has been subpoenaed or been bound in a recognizance as such, and, if such objection be established, the person summoned shall be set aside.

It may be that thirty-two persons answered to their names as summoned on the general venire returnable on the first day of the term of court as alleged in the plea in abatement, and that four of these persons were found to be disqualified or exempt from jury duty and were discharged or excused from service by the court, and that thereupon the grand jury of eighteen persons were selected from the remaining twenty-eight qualified persons so summoned on said general venire. The grand jury so selected and empanelled would be lawfully selected and empanelled, and the plea in abatement filed by the defendant does not obviate or overcome this supposable answer thereto. If for any sufficient cause a grand jury may have been legally drawn from the twenty-eight names of persons so summoned on the general venire, the plea is defective, because it does not allege that such cause did not exist. Jenkins v. State, 35 Fla. 737, text 802, 18 South. Rep. 182.

The third assignment is based upon the denial of the motion for a new trial.

One ground of the motion is, "the court erred in permitting the witness W. A. Lewis to testify to certain confessions of the defendant without laying a proper predicate."

W. A. Lewis was called as a witness for the State, and testified that he knew the defendant and arrested him for murder. Lewis then said: "I had a conversation with Duke Thomas at the time of making the arrest. Will Finlayson was present. Will was the first man to speak to him. Will made the arrest. We offered him no inducement, reward to make a statement, neither did we threaten him in any way. As a matter of fact, we tried to get him not to talk. We cautioned him not to talk."

Thereupon the witness was asked: "What did he say?" The witness answered: "A. After we arrested him we had

to walk down the railroad about three hundred yards back there. There was nothing said to him until we got him to the buggy. We had no hand cuffs. We just tied his hands and set him in the bottom of the buggy. Will Finlayson got in the buggy with him, and I stood up behind. We had to drive three hundred yards to get to the Cottondale road and when we got in the road he said 'How did you all find out about this?' I said 'they telephoned from Cypress' He said 'That negro aint dead.' I said 'No.' I did not think then he was dead. He said 'That negro aint dead he sure is a good negro.' I said what did you kill him with? He said 'I killed him with a little piece of piping about that long.' I said 'Where did you get this piping?' "

By the defense: Now if the court please it seems he was holding out an inducement to testify.

The Court: Objection is overruled. Defendant excepts.

Q. Go ahead.

The witness then proceeded with his testimony without further objection.

We do not think this testimony showed that Mr. Lewis held out an inducement for the defendant to "testify."

After the State closed its testimony the defendant was recalled and testified as follows: "They say it was Mr. Will Finlayson who arrested me. Yes, sir, that other gentleman was there close by. Mr. Finlayson he ran up at the time of arresting me, commenced firing it and cussing me, I thought he was going to shoot me. I told them at the time of the arrest that I was the man who had done the killing. My reason for doing so was because I was afraid of Mr. Finlayson. I was afraid he would kill me; because Mr. Finlayson was cussing and shooting off his pistol."

Thereupon the defendant moved the court "to strike the entire testimony of Mr. Lewis as to the admission of

the defendant, on the occasion testified about upon the ground it is shown that the defendant was put in fear and was under duress at the time of making the statement."

The motion was denied and defendant excepted.

Mr. Lewis testified: "Finlayson did fire off his pistol two or three times while he had him in custody, because one Jim White and one Dillon who had gone below—we decided that we would shoot the pistol to let them know. It was a signal. * * * I told Duke this, I said 'Duke you don't have to talk. He said I can talk if I want to.' Will said, 'Let him talk, if he wants to tell it Guss. That's all that was said.'

We do not think the court erred in admitting the confession before the defendant testified in regard thereto.

If, after the introduction of the confession, it appeared by the subsequent testimony of the defendant that such confession was not free and voluntary, the court should have arrested the examination and withdrawn the evidence of such confession from the jury. "In considering whether the confession is voluntary, the trial judge must, of course, determine the facts even upon conflicting evidence, and when we are called upon to review his ruling upon such evidence, we must accord to his finding the presumption that it is correct. What circumstances constitute improper influences such as will exclude confessions, are questions of law which may be reviewed by an appellate court, but the credibility of the evidence to prove the circumstances, as well as the credibility of conflicting evidence, are questions for the trial court, not reviewable by us, unless the court below has clearly erred in its conclusion of facts; or, as expressed by this court in Coffee v. State, 25 Fla. 501, text 514, 6 South. Rep. 493, unless the court below 'has transcended its discretion

and a wrong may have been done thereby.'" Holland v. State, 39 Fla. 178, 22 South. Rep. 298.

The court below, reconciling this testimony as far as possible, and exercising its power to reject such as it believed not to be credible, found that the testimony of the witness Lewis was true in substance, and did not withdraw the confession from the jury, and we see nothing in the circumstances to justify us in reversing his conclusion of the facts. If the testimony of Lewis is true the confession was voluntarily made and admissible in evidence. The court did not err in refusing to exclude it.

The court charged the jury in part as follows: "The question of a premeditated design to effect the death of a human being is a question of fact to be found by the jury, from the evidence beyond a reasonable doubt, like every other material fact in the case. But the law does not require that such premeditated design to effect the death to prove only by direct testimony. The existence of a premeditated design to effect death, as well as its formation, are operations of the mind as to which direct testimony can not always be obtained, consequently, the law recognizes that it may be proven by circumstantial evidence. It will be sufficient proof of such premeditated design if the circumstances proven to exist relate to the acts, declaration and conduct of the accused; the circumstances attending the homicide, if a homicide was committed, and other circumstances proven by the evidence bearing upon the question, convince the jury beyond a reasonable doubt and to a moral certainty of the existence of such design at the time of the homicide, if a homicide was committed, and that such homicide was committed in pursuance of such design."

In the motion for new trial, objection is taken to the last sentence of that part of the court's charge quoted above; but we find no reversible error there.

The defendant contends that the verdict is contrary to the evidence, the law and the charge of the court, and that the evidence is insufficient to sustain the verdict.

We have read and considered the evidence with the care it deserves in view of the death sentence imposed.

The defendant testified in behalf of himself: "I remember the killing that occurred at Cypress. The day it occurred Cleveland Holmes and I and Wilson had been gambling, all of us. It first began Friday night, and I broke them all, and that is how it was. I had a fuss with Wilson on Friday night, and he tried to cut my throat. On Sunday morning I saw him again. * * He came to the shanty where we were. * * He said, 'Let us go off and gamble some.' * * I went off to gamble * * at the time of the killing Wilson was facing me. * * We were playing the game. Holmes was gambling too like the rest of us. After all the money was out I said, 'Let us stop—you have no more money no how. I want to stop.' He said, 'you aint going to leave here with all that money.' * * He said, for me to give up the money which I had won from him. I told him that I would die before I would give it up."

The defendant stated further to the jury that he struck the deceased with a fence-rail. The defendant claimed he struck deceased in self-defense, that deceased drew his knife and tried to cut defendant and that Cleveland struck deceased twice with the iron piping and defendant was trying to get loose from deceased, who had defendant by the neck and his knife on him. But Cleveland denied this, and testified that the defendant struck deceased with a piece of piping and a fence-rail. "He hit him with that piece of pipe, hit him there (illustrating). Wilson fell over * * * he got a piece of burnt rail and wore him out with that about the face. I could not tell how many licks, but I know he beat there a pretty good while. * * *

After Thomas struck him with the piping and fence rail, he searched him. He found two pocket books, a red one and a black one, and a razor-blade knife and he took his cap, a snuff-colored cap—a brown cap— He taken the black pocket book and tore it up and throwed it down side the road. He said the red one was a good one and put it in his pocket and put the cap on. He kept the pocket knife, there was no money in the pocket book, he opened it before me—  *  *  *  Wilson he did not have any weapon or attempt to use one on Duke at this time. He had nothing but a pocket-knife on his person. He did not offer to shoot him or to strike him or anything else. *  *  He didn't attempt to do anything before he killed him.  *  *  No one else was present at the time of the killing but myself, Wilson and Duke Thomas. The first time Thomas hit Wilson right there (illustrating in his head). He hit him on the forehead. The second time he hit him right along there (illustrating). He hit him both times with the pipe. The next time he hit him in the mouth with a piece of burnt rail."

W. A. Lewis testified as to the defendant's confession in part as follows: "He said he killed him with that piece of piping.  *  *  He said while the nigger was getting out the cards, he hit him with this piece of pipe. He said, 'you see this cap? That is this nigger's cap; I hit him across the head with this and bursted his head—you see that hole—I bursted his head.' He said that he got a piece of fence-rail and beat him over the head with the rail.  *  *  He said something about the nigger Holmes—asked us if we had Holmes in jail. I told him yes. He said, 'well you might just as well turn that nigger out, he never had anything to do with it; he said his life is sweet to him. He said, 'I want the judge to hang me now.' He said, 'if I knew then what I know now, you all would have to shoot me; I would have run to

make you shoot me and kill me, but I was afraid you would shoot me up and make me suffer.' * * Duke claimed that the negro Cleveland Holmes had nothing to do with it, but when Duke got to Marianna, he said that Cleveland went and got the rail, * * he did not say, I will take all the blame on myself.' He said, 'you had just as well turn him loose if you have him in jail.' He acknowledged it at first, and then when we got him near town he said the other negro went and got the rail."

The jury believed the evidence for the State, and we see no reason why they should not have done so, and we think it sufficient to support the verdict.

Finding no error, the judgment is affirmed.

All concur, except TAYLOR, J., absent on account of illness.