TOMMIE LEE BROWN v. STATE

184 So. 518.
Division B.
Opinion Filed November 15, 1938.

*Edgar C. Thompson, Harry Dietz* and *H. J. Quincey,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

CHAPMAN, J.—On the 3rd day of February, 1937, a jury of Palm Beach County, Florida, filed its verdict in the Circuit Court of Palm Beach County, Florida, finding Tommie Lee Brown guilty of murder in the first degree. Plaintiff in Error was charged in an indictment rendered by a grand jury of said County with the unlawful killing of one Fred Holland in the County aforesaid on the 12th day of December, 1936. On February 19, 1937, plaintiff in error, Tommie Lee Brown, for said crime was by the Circuit Court of Palm Beach County, Florida, sentenced to be electrocuted. From this death sentence or judgment writ of error was taken, transcript of record perfected, and briefs filed on the part of counsel for plaintiff in error and the State of Florida, and several legal reasons are presented and argued seeking a reversal of the said judgment of conviction. The parties in this opinion will be referred to as the state and defendant, as they appeared in the Court below.

On January 13, 1937, defendant filed a plea in abatement in which it was alleged that J. W. Salisbury was not the State Attorney for the Fifteenth Judicial Circuit and that his name appearing on the indictment as the prosecuting officer therefore rendered the indictment void. The material portions of the plea in abatement are, viz.:

"That said indictment is signed by one J. W. Salisbury as State Attorney of the Fifteenth Judicial Circuit of the State of Florida; that the Court judicially knows that said J. W. Salisbury is not the State Attorney for said Circuit but that one Louis Maier is the duly appointed, commissioned and qualified State Attorney for said Circuit; that the said J. W. Salisbury holds a commission, dated May 22, 1933, for four (4) years, as State Attorney of the Fifteenth Judicial Cir-

cuit created pursuant to Section 35, Article 5, Constitution of Florida, and none other; that Louis E. Maier, Esq., held a commission, dated July 2, 1931, for four (4) years, as State Attorney of the Twenty-Second Judicial Circuit, created pursuant to Section 35, Article 5, Constitution of Florida, and now holds a commission, dated June 26, 1935, for four (4) years as State Attorney of the Fifteenth Judicial Circuit created pursuant to Section 45, Article 5, Constitution of Florida; that the said Louis F. Maier, and not the said J. W. Salisbury is now the State Attorney and Prosecuting officer of this Court; that there is hereto attached certified copies of each of the above mentioned commissions, and made a part hereof, the same as if set forth herein *in haec verba.*

"WHEREFORE defendant prays that the action against him be abated and that he be discharged."

The Commissions of the Honorables J. W. Salisbury and Louis E. Maier are attached and by appropriate allegations made a part of the said plea in abatement. The State of Florida, by the State Attorney, directed a demurrer to the plea in abatement, the grounds of which are (a) the plea in abatement fails to set forth a defense; (b) the plea on its face shows that J. W. Salisbury is the qualified acting State Attorney; (c) the plea is vague, indefinite and uncertain. The demurrer was by the lower court sustained and this ruling is assigned as error. The record shows that on June 20, 1933, the Hon. J. W. Salisbury was appointed State Attorney for the Fifteenth Judicial Circuit of the State of Florida for a period of four years from and after June 20, 1933. The indictment here signed by J. W. Salisbury, State Attorney of the Fifteenth Judicial Circuit was filed in Palm Beach, County, Florida, on the 7th day of January, A. D. 1937, and when filed the period of four years for which the State Attorney was commissioned had not expired and

would not expire until June 20, 1937. We hold that this assignment is without merit. See Section 45 of Article 5 of the Constitution of Florida adopted in November, 1934; Chapter 17085, Acts of 1935, Laws of Florida; State, *ex rel.* Landis, v. Bird and Viney, 120 Fla. 780, 163 So. 248.

It is next contended that the lower court erred in over-ruling and denying the defendant's motion to quash the indictment on the grounds, to-wit: (a) that the wound inflicted on the deceased was not done with a premeditated design to effect his death; (b) the venue of the place of inflicting the alleged mortal wound is not alleged; (c) the indictment fails to allege facts constituting murder; (d) that J. W. Salisbury is not the legal prosecuting officer of said court, but that Louis Maier is and the indictment fails to have his name attached thereto. The test of the sufficiency of an indictment under the law of Florida is whether or not it is so vague, inconsistent and indefinite as to mislead the accused and embarrass him in the preparation of his defense or expose him after conviction or acquittal to substantial danger of a new prosecution for the same offense. See Lamb v. State, 90 Fla. 844, 107 So. 530; Ward v. State, 83 Fla. 311, 91 So. 189. We fail to find error on the part of the lower court in denying the motion to quash.

It is next contended that the lower court erred in admitting into evidence for the consideration of the jury, over the defendant's objection, a confession freely and voluntarily made without fear of punishment or hope of reward. The confession assigned as error is:

"Mr. SALISBURY: If your Honor please, I want to read this confession to the jury.

"'Following is the deposition of Tommie Lee Brown taken at 12:10 A. M. on the 14th day of December 1936 in the office of Hiram W. Lawrence, Sheriff of Palm Beach County, Florida.

" 'BY SHERIFF LAWRENCE:  Q  Tommie, this is an investigation in the death of Fred Holland.  Do you feel like making a statement on your own free will without any promises of leniency?  A  Yes sir.  Q  Free and voluntarily you want to make a statement?  A  Yes sir.  Q  Do you swear this to be the truth?  A  Yes sir.  Q  In the presence of D. T. · Sholtz, Tommy Stears, Mr. Charles Francis Coe, Mr. A. Budd, Mr. Barney Savage and the Sheriff, Mr. J. C. Hardwick, Jr., Mr. H. C. Motter, Mr. J. M. Tapscott and Mr. Virgil Strain?  A  Yes sir.  Q  Do you now wish to make this statement freely and voluntarily in repudiation to what you formerly made as a statement this morning, in other words in denial of what you said this morning?  A  What are you speaking of?  Q  The statement you made in reference to all these other negroes to help kill a negro is a mistake.  You swear to tell the truth and nothing but the truth so help you God.  You state just exactly what took place, where you put Fred's body and everything?  A  Yes sir.  Q  Start when you first planned to do it, Friday.  Talk plain and slow so we can understand every word you say.  A  Friday I made up my mind to kill Fred and get the money he had, but I didn't kill him Friday night, I waited until Saturday night.  I went to town with him to the Boleta house.  I went with him Saturday night to the Boleta house and after they threw the number on our way back I stopped and we went and got some electric light bulbs and got a pair of shoes out of the shoe shop and came around to Kelsey City.  I got out and went to John C's.  I came back and got in the car with Fred and went down to Mr. Davis and stopped down there.  I tried to buy some moonshine.  I couldn't get it so we left for Riviera.  We go on around the curve and I killed Fred with the crank.  Q  Tell us what you did.  A  I hit him twice in the car and he slumped over on the door.  Q  The door came open?  A

Yes sir. Q And you went around the car? A Yes sir and drug him out. Q Around the automobile to the west side of the road in the palmettos? A Yes sir. Q When did you take the money. A Out in the palmettos. Q When did you jerk the watch off? A In the palmettos. Q Then what did you? A I pulled his lumber-jacket off. Q What else? A I pulled his top shirt off and I pulled his undershirt off. Q Why did you do that? A To see if he had any money around his waist. I drug him back and put him in the car. Q Did you see a car coming? A Yes sir. Q Tell what you did. A I laid down in the palmettos. Q Did a car pass? A Yes sir. Q Then what did you do? A I got up. Q What else? A I drug him back to the car. Q Where did you put him? A I put him in the back seat. I cranked up and carried him on to the lake. Q How did you go? A By Monroe Heights until I got to the Dixie. Q The old Dixie? A Yes sir. Q Then what direction did you go? A North until I got to the Silver Beach Road. I turned to the right and went right down Silver Beach Road until I got to the lake and I drove the car to a stop. I dragged Fred out and a dog came and began to bark. I picked up some sand and ran him away the first time. He came back and I picked up some more sand and ran him away. The dog went back to the house. Q Did you see a light? A As I was throwing Fred in the lake I looked up and saw the light in the house. I felt in my pocket and got some receipts. Q What was one of these receipts? A One was for my refrigerator. I wrapped the receipts up around the watch and threw it as far in the lake as I could. I came on back and got in the car, cranked up and went back up the Silver Beach road until I got to the Old Dixie. I went north, drove the car to some woods, got out and walked home, changed pants went over to the other side and stayed over

there the balance of the night. Q What do you mean the other side? A By Lindseys. I stayed there until the law found me. Q How much money did you get off of him? A I think it was a dollar and thirty five cents ($1.35) and his watch. Q Did I understand you to say that when you drug him out of the car and put him in the lake he was still groaning some? A Yes sir. Q And you killed him because you claim that you figured he got $25.00 a week out of Boleta at Kelsey City and $25.00 at Riviera, is that right? A Yes sir. Q How much did you figure he would have on him? A $75.00 being it was Saturday night. Q How did you lose your hat? A I went to run back and fell over some bushes and lost my hat and couldn't find it when I saw this car coming. It was Sunday morning I got Harry Adams to drive me in his car to get it. Q Did you find it? A Yes sir. Q Where? A Right off of where I killed Fred.

" 'By Mr. Charles Francis Coe: Q When you returned from finding the hat which was where you first hit Fred, when Harry drove you back from that point the officers picked you up? A Not right there. Q Where did they pick you up? A We stopped at Mr. Davis' and got some moonshine. He let me have it on credit. Q How much did he charge you for it? A Fifty cent (50¢). I left there and went over to Coffers to get some moonshine and he didn't have any. He asked me to carry him to town for some. I told him I couldn't carry him. Q Why couldn't you carry him? A I asked Harry about carrying me. Harry said he would carry me at 10 o'clock. We left and went back to Lindseys and came right by to John C'S. That's where the law got me. Q Do you want to tell us why you lied about the other six people you brought into your statement this morning? A I was just trying to help myself. Q. But it was a lie. All of it was a lie? A Yes

sir. Q None of these people you mentioned in your statement this morning knew anything about the killing before and after it took place? A No sir. Q And you went by and got the crank from Mr. Hollands car but he didn't know what you were going to use it for? A No sir. Q Why do you tell us this, to ease your conscience? A Yes sir.

"'By HIRAM W. LAWRENCE, SHERIFF: Q Don't you feel better now that you have it off your chest and told the truth? A Yes sir. Q And tomorrow morning we will go up and see if we can find the watch? A Yes sir. Q Where did you tear your pants? A These have been torn chief. I had on a pair of light pants when I killed him. Q Did you tear them up? A My mother had washed them. Q These are not the pants you had on when you killed him? A No sir. Q You told us this morning they were didn't you? A Yes sir. Q That was a lie? A Yes sir. Q You stated a minute ago that Harry drove you out to get your hat and you went back to Lindseys to get some moonshine and then you drove on to another place to get some more. A Yes sir. Q Had you drank the first pint? A Yes sir. Q You got about $1.35 from Fred's clothes and went back to Davis' and spent this money? A Yes sir, all but 57c. Q Did you have anything charged to you Saturday night. A Yes sir. Q How much? A They told me it wasn't but 45c or 50c but it was more than that. I got a pint of shine and I got some beer. Sunday morning I got the pint of liquor. Q You didn't pay for that? A No sir. Q You told me you spent most of the money you got from Fred's body. A I got that on credit what I was calling just now. Q You know what you are saying do you? A Yes sir. Q You are not sleepy? A No sir. Q You are not drunk? A No sir. Q You are not hurt? A No sir, there is nothing the matter with me. Q

You realize everything that's going on do you? A Yes sir. Q You know you are in serious trouble? A Yes sir. Q And you know you are better off with your conscience clear, having told the truth? A Yes sir. Q When you put Fred back in the car how did you get him in there? A I drug him in. Q Did you get in ahead of him and drag him in? A Yes sir. Q How did you do it? A I drug him in by the feet. Q Did he ride with his feet up and his head down all the way to the lake? A He had his feet down. Q Did you drag him in head first or feet first? A Feet first. His feet were half up on the seat. Q Did you put the crank back in the car? A I disremember. Q You do not remember whether you left the crank or whether it fell out? I don't remember. Q When you backed up from the lake, what direction did you back? A South. Q You turned to come back out the way you went in. A Yes sir. Q And you went west on the same road you came on until you got to the Old Dixie? A Yes sir. Q You took the three officers today to where the car was hid? A Yes sir. Q You were afraid if you didn't make sure Fred was dead he would tell on you and you would get in trouble? A Yes sir. Q You knew if he lived he would tell on you and you would be in trouble? A Yes sir. Q And the reason you took him to the lake was what? A I thought he would sink. I didn't know he would float. Q These packages are the packages that Fred got are they? A Yes sir. Q I believe you stated you made two stops when you started? A Yes sir. Q One was to get some electric light bulbs? A Yes sir. Q Are these the ones? A Yes sir. Q And the other some shoes from the shoe shop? A Yes sir, some black shoes. Q What shoe shop was it? A It was in Northwood. Q Did you get the electric lights in Northwood? A Down town. Q Whose shirt is that? A Fred's shirt. Q

How did you get it off of him? A I tore it off of him. Q His lumber jacket you saw in here today is the one you took off of him? A Yes sir. Q Is the undershirt you saw today the one you took off of him? A Yes sir. Q You were perfectly sober when you hit Fred with the crank? A I had been drinking some. Q You weren't drunk? A I wasn't plum drunk. Q You were sober enough to know what you were doing? A Yes sir. Q You were sober enough to get the money and count it and get the watch and lie down and hide when you saw the lights coming? A Yes sir. Q And you had presence of mind the next Sunday to remember where you left your hat? A Yes sir.' "

The trial court instructed the jury on confessions, viz.: "22. All confessions should be acted upon with great caution by courts and juries. The credibility of a confession is for the jury to determine. You are to determine the credence (which) should be attached to the alleged confession, every part thereof. It is your duty to give such confession a fair and unprejudiced consideration. The confession should be considered as a whole. You should fairly consider the time and all the circumstances of its making, its harmony or inconsistency in itself or with the other evidence in the case, and the motives which may have operated on the party in making it. You should give effect to such parts as you find sufficient reason to credit, and reject from your consideration all that you find sufficient reason to reject, but you should not give effect to any part or reject any part, arbitrarily or capriciously."

Where the evidence clearly and fully shows that a defendant, while in custody and under arrest under charge of commission of the crime, after being fully warned by the officers having him in charge that whatever he might say might or would be used against him at his trial, freely and voluntarily makes inculpatory statements to such officers, and that

such officers did not put him in any fear, or hold out to him any promise or hope of benefit or reward for such confession, then such confessions are admissible in evidence. See Moore v. State, 68 Fla. 91, 66 So. 431.

In the case of Davis v. State, 90 Fla. 317, 105 So. 843. this Court had before it a confession of a defendant charged with crime, and said:

"The law is well settled that to render a confession by one charged with a crime admissible in evidence against him, it must be voluntarily made though it may not be the spontaneous utterance of the one charged, and it may be obtained by questioning in the custody of an officer or in jail. The jury may always consider the method and circumstances under which a confession is obtained in determining its credibility. Underhill on Criminal Evidence (2nd ed.) 140; McNish v. State, 47 Fla. 69, 36 South. Rep. 176; McDonald v. State, 70 Fla. 250, 70 South Rep. 24; Phillips v. State, 88 Fla. 117, 101 South. Rep. 204.

"The question of whether or not a confession is voluntary is one for the trial judge to determine, and even though the evidence as to voluntariness be conflicting if called upon to review the ruling of the trial court the appellate court must indulge the presumption that the finding was correct. Circumstances constituting improper influences that would exclude confessions are questions of law reviewable by the appellate court, but the credibility of the evidence to prove the circumstances and the credibility of conflicting evidence are questions for the determination of the trial court, not reviewable by the appellate court, unless error in the conclusion in the court below is manifest. Thomas v. State, 58 Fla. 122, 51 South. Rep. 410.

"The testimony of the State and defendants as to whether or not the several confessions were free and voluntary was in hopeless conflict, but the whole matter was rehearsed both

in the absence and in the presence of the jury as the practice here approved, and unless it fully appears that there was an abuse of the discretion imposed in the trial court, his determination as to the admissibility of the confessions is conclusive. The testimony of those in the presence of whom the confessions were made shows that each was freely and voluntarily made, and we find nothing in the record indicating abuse on the part of the trial court.

"When the State has proven the confessions to be free and voluntary, the burden is then cast on the defendants to rebut this proof. Sims v. State, 59 Fla. 38, 52 South. Rep. 198. Evidence was submitted for this purpose, but the jury after hearing all the testimony and considering the facts, accepted the case made against the defendants, and found them guilty. It is true the defendants were all young men, ages ranging from eighteen to twenty years, but the record shows them to be physically strong and mentally alert. They were fully advised, and their confessions properly admitted."

.This Court considered the same question in the case of Nickels v. State, 90 Fla. 659, 106 So. 479, and said:

"When it is made to appear *prima facie* by the State that the confession was made in conformity with the rule above stated, the burden is then upon the defendant to show that it was in fact not a voluntary confession. Sims v. State, 59 Fla. 38, 52 South. Rep. 198. In considering whether the confession is voluntary, the trial judge must of course, determine the fact even upon conflicting evidence, and when we are called upon to review his ruling upon such evidence, we must accord to his finding the presumption that it is correct. What circumstances constitute improper influence such as will exclude confessions, are questions of law which may be reviewed by an appellate court, but the credibility of the testimony to prove the circumstances, as well as the credibility of conflicting testimony, are primarily questions for

the trial court, not reviewable by us, unless the court below has clearly erred in its conclusion of facts, or, as expressed by this Court in Coffee v. State, 25 Fla. 501, text 514, 6 South. Rep. 493, 23 Am. St. Rep. 525, unless the court below 'has transcended its discretion and a wrong may have been done thereby.' Holland v. State, 39 Fla. 178, 22 South. Rep. 298; Thomas v. State, 58 Fla. 122, 51 South. Rep. 410; Davis v. State, decided at this term.

"The law is well settled that when an extra judicial confession is made in conformity with the rule above stated it is admissible, though it may not be the spontaneous utterance of the accused. The fact that the confession was obtained by questioning the prisoner will not alone exclude it, even though some of the questions be leading and assume guilt, if the confession in fact emanates from the free will of the accused and is without inducement of hope, fear or other illegal influence. Davis v. State, decided at this term. See also Ziang Sung Wan v. United States, 266 U. S. 1, 45 Sup. Ct. Rep. 1, 69, L. Ed. 131, decided October 13, 1924; Underhill's Crim. Ev. (3rd ed.) 352; Curry v. State, 203 Ala. 239, 82 South. Rep. 489; State v. Penney, 113 Iowa 691, 84 S. W. Rep. 509; Young v. State, 90 Md. 579, 45 Atl. Rep. 531; State v. Priest, 117 Me. 223, 103 Atl. Rep. 359; State v. Barrington, 198 Mo. 23, 95 S. W. Rep. 235. A mild degree of persistency in such questioning is sometimes sanctioned. People v. Simsen, 153 Cal. 387, 95 Pac. Rep. 863; State v. Banneik, (N. J.) 64 Atl. Rep. 994. When considering such a confession, however, trial courts should exercise great diligence to ascertain whether such questioning was so repeated and persistent and applied under such attending circumstances of intimidation or inequality between the interrogator and the accused as to impair the freedom of will of the latter and thereby amount to compulsion. The effect as well as the form of the compulsion should be carefully

weighed and considered, for a confession obtained by compulsion must be excluded, whatever may have been the character of the compulsion. Ziang Sung Wan v. United States, 266 U. S. 1, 45 Sup. Ct. Rep. 1, 69 Law Ed. 131, decided October 13, 1924. * * * " See Deiterle v. State, 98 Fla. 739, 124 So. 47; Chambers v. State, 117 Fla. 642, 158 So. 153; Murray v. State, 25 Fla. 528 6 So. 498; Sims v. State, 59 Fla. 38, 52 So. 198; Green v. State. 40 Fla. 474, 24 So. 537; Coffee v. State, 25 Fla. 501, 6 So. 493.

The evidence shows the defendant to be a colored man around 23 years of age and went to Palm Beach County, Florida, during the year 1925 and lived there continuously since, except a period of nearly five years while serving a sentence at Raiford for stealing an automobile. He was uneducated and was making his home with his parents when the crime was committed. He was arrested on suspicion within two or three hours after the body was found floating on Lake Worth, along with several other colored men. He was questioned some two or three times on Sunday, but was returned to jail. On the next day (Monday) around 9:00 o'clock A. M. he was taken by the officers from the jail to the Sheriff's office and questioned. He made a first confession involving several other colored men around Palm Beach, but the officers checked his confession and learned that it was false. He made the second confession shortly after the first and advised where the deceased's car was left by him after placing the body in Lake Worth. The officers took the defendant in a car and the defendant directed them where and how to find the car. They followed his suggestions and found the car of the deceased with a flat tire and with blood stains on it where the defendant stated he had left it the night of the killing. He likewise directed the officers to the spot on the highway where he struck deceased with the iron instrument used to start the motor. At this

point blood was found on the palmettos and a lumber jacket and shirt worn by the deceased were found blood stained. Considerable blood was found near the lake where the defendant stated he stopped the car and dragged the body some distance to the water where the body was later found. He lost his hat at the lake and got one of his friends to go with him and his hat was found. The deceased was seen alive riding in deceased's car the last time with the defendant. The defendant changed clothes and the trousers worn by him on Saturday night when the crime was alleged to have been committed were found in the wash at his mother's home. The defendant testified before the trial court that the officers threatened him with violence, beat him with a hose, caused him to sit in an electrically equipped chair in the Sheriff's office and the current turned on him, and that he was deprived of food and continuously grilled for approximately 15 to 18 hours. The officers with him during this period testified that the defendant was not threatened, promises were not made to him, he was not put in fear, nor was a reward or promise of a reward or hope or any other unlawful inducement made. The only testimony offered was that of the defendant to show that the confession was not voluntarily made. The admissibility of such a confession, after hearing all the testimony on the subject, shall be determined by the trial judge as a mixed question of law and fact, from a preliminary consideration of the evidence offered by either party bearing on the circumstances, conditions and surroundings under which the confession was made, which may include evidence as to age, sex, disposition, experience, character, education, intelligence, previous training, and mental condition of the accused, bearing in mind that all confessions of the accused should be acted upon by both the court and jury with great caution. See Coffee v. State, 25 Fla. 501, 6 So. 493; Nickels v. State, 90

Fla. 659, 106 So. 479. When a trial court has given due consideration to conflicting testimony concerning a voluntary confession, an appellate court in reviewing the said ruling on writ of error must accord to the rulings of the trial court the presumption that it is correct. See Thomas v. State, 58 Fla. 122, 51 So. 410; Jeffcoat v. State, 103 Fla. 466, 138 So. 385. We find no merit to this assignment.

In an extraordinary motion for a new trial it was made to appear that one H. D. Hasselman was not a fair and impartial juror but that he was biased and prejudiced against the defendant, because the said juror, during the deliberation of the jury on its verdict, gave evidence or told the jury that the defendant had been arrested on a former criminal offense and was a dangerous man and a "bad egg;" that the family of the defendant was a dangerous family and that some of the members thereof were afraid that defendant would murder some of them when he returned from prison, and that these statements were made by the juror on or during the time of its deliberation on a verdict and some three or four of the jurors signed affidavits to support the statement and they were filed in support of the motion as made by counsel for defendant. We do not think the motion had merit. See Lamb v. State, 90 Fla. 844, 107 So. 530; Lindsey v. State, 88 Fla. 135, 101 So. 273. The record here shows that the extraordinary motion for a new trial was filed some thirty-five days after the rendition of the verdict, while Section 4497 C. G. L., requires that a motion for a new trial shall be made within four days after the verdict shall have been rendered.

We have given careful consideration to each assignment of error and think that substantial justice was awarded in the lower court. The judgment is affirmed.

TERRELL, C. J. and WHITFIELD, BROWN and BUFORD, J. J., concur.

THOMAS, J., not participating.