## EDGAR FLOWERS v. STATE OF FLORIDA

12 So. (2nd) 772      January Term, 1943
March 30, 1943      En Banc
Rehearing Denied April 16, 1943

*Bryan & Bryan,* for appellant.

*J. Tom Watson,* Attorney General, *Woodrow M. Melvin,* Assistant Attorney General, and J. Rex Farrior, State Attorney for appellee.

CHAPMAN, J.:

The appellant, Edgar Flowers, on May 7, 1942, was indicted for the crime of rape by a grand jury of Hillsborough County, Florida. He was placed upon trial and by a jury found guilty on June 5, 1942. His motions for arrest of judgment and new trial were denied and the defendant below sentenced to death. He has perfected his appeal therefrom to this Court. The victim is the wife of a soldier at the time stationed at MacDill Field with night duty assignments. His wife was residing at Apartment No. 10 situated at 111 South Newport Street, Tampa, Florida. She visited among friends and returned to the apartment about 11:30 P. M.; failed to lock the entrance door to the apartment and retired. Her testimony discloses that she was raped by the appellant in her bed in the apartment between 1:00 and 2:00 A. M. November 11, 1941. The appellant worked as a waiter at a restaurant at McDill Field and was there arrested on the afternoon of April 23, 1942..

The crime was reported to the police officers, when a description of the assailant was obtained and a search by the officers instituted for the person answering the description. The husband of the victim took many of his meals where appellant was employed but failed to identify him by the given description. The victim ate a meal with her husband at the restaurant after she was assaulted and prior to the arrest of the appellant and told her husband that "the waiter looked like her assailant," but it was lightly considered or disregarded by her husband.

Counsel for appellant pose for adjudication six questions. Three of these go to the legal sufficiency of the evidence adduced by the State to sustain the verdict. The fourth raises the question as to the admissibility into evidence over the objection of the defendant of a shoe alleged to have been owned by the appellant and subsequently found near the scene of the crime. Questions five and six challenge the voluntariness of confessions alleged to have been made by the appellant to the officers concerning the crime after he was arrested.

Questions one, two and three may be considered under one assignment as they raise the question of the legal sufficiency of the testimony adduced by the State to sustain the verdict rendered, absent the challenged confessions, and in contradiction of the evidence offered by the appellant during the progress of the trial to sustain an alibi. The answer to these questions is found in the testimony. The record discloses that the victim was awakened around 1:00 o'clock A. M., and testified, "I just felt like there was somebody in the room with me and I raised up and said 'Who is it?' and nobody answered and I said, 'Who is it?' And he said 'Don't move or I will shoot.' So then I raised up in the bed and he said, 'Don't you scream,' and said 'If you scream I will kill you.' And I said, 'What are you going to do?' And he said, 'I am going to kiss you and am going to walk right out the door,' and I started crying, and then he came right up to the bed to me, and so then, he leaned over and kissed me and he kept saying 'don't you scream, don't you scream, if you do, I will kill you;' So then he came on up and put a gun in my

side, and then he came over and got up on the bed, and I kept using every excuse that I possibly could."

"Q. Did he have intercourse with you then? A. Yes, sir. Q. And then after he completed that act of intercourse, go ahead and state what happened? A. I got up and I said I had to go to the bathroom and he went with me and he told me that they called him 'White Joe,' and that he had just gotten in from Atlanta that day, and he said, 'Do you have fun like this all of the time?' And so then he kneeled right in front of me in the bathroom and he had a knife in his hand; and then after I kept talking to him, telling him that my husband was coming home, he asked me what he did, and I told him that he was in the Army, and he asked me if he was working at MacDill or Drew, and I told him MacDill, and he asked me what my name was and I told him my maiden name; and so, I kept talking up to him and finally got him to the kitchen door, which was unlocked and kept talking to him and he made me promise that I would meet him on Wednesday night. This was early Tuesday morning. Q. In other words, this was Monday night and this happened on early Tuesday morning? A. About 1 o'clock early Tuesday morning." He made you promise that you would meet him the following Wednesday night? A. That is right, and he asked me where to meet him and I told him I didn't know, that I had just been in Tampa a little while and he said to meet me on Cass Street Bridge at 7:30, and he said if you don't meet me there, there is no use for you to come back and go to bed, because I know where you are and there is no use to pull the shades down, because I know where you will be if you don't meet me there, and he told me that if I called the police after he left my apartment that night, that he would come back and kill me. Q. During all this conversation that you were having with him, you were standing, I believe you said, near the bathroom door towards the kitchen there? A. That is right. Q. Was there any light on in the house? A. Yes sir, and the street lights were shining in my apartment, and if you know these Newport Apartments there is a Court that goes all around it and the lights from the court were shining in the Apartment, and I got a real

good look at him, and then I told him to let me see who I am meeting, so I will know who, and he opened the door and I got almost to his face and he said, 'No, I don't believe I will,' and so after he got out of the door he went to my bedroom window and stood there and called me and whistled for me, and if I could have gotten to the telephone right then, then the Cops could have caught him when he got there. Q. All together then he was in the house there about how long after you awakened? A. I imagine 10 or 15 minutes."

On cross examination she testified:

"When you saw him out at MacDill Field, what was he doing out there? A. Working in the P. X. out there. Q. Working where? A. In the Post Exchange. Q. And that was some two or three weeks before he was finally arrested? A. That was on Sunday before he was caught the next Thursday week. Q. On Sunday before he was arrested the following Thursday week? A. Yes sir. Did you report to anyone at the time that you saw him at MacDill Field? A. No sir. Q. Did you report to anyone? A. Except my husband. He was sitting in front of the table, in front of me, and we were in there eating breakfast. Q. You don't know whether he reported that to the Police or not? A. I don't know. Q. Then, you and your husband waited more than a week before you ever reported to the Police that this man was working there' at MacDill Field? A. We did not report it at all. Q. You did not report it at all? A. No Sir. Q. If you knew that this was the same man why did you not tell the Police? A. I saw him as he passed by our table, and I just got a glimpse of him, and as he went by I said, 'Charlie, that looks like the negro,' and he said, 'You are just imagining things.' Q. Mrs. Oakes, why was it that you did not tell the Police that this man was working there at the Post Exchange if you knew that he was the same man? A. I say I didn't get a good look at him. I got just a glance at him as he went by. Q. Then you were not certain that he was the same man? A. Not then, because I didn't get a good look at him. Q. Just when did you become certain that he was the same man? A. When I saw him in the line-up at the Police Station. Q. When was that? A. On Friday after he was caught on

654

Thursday. I don't know the date. Q. You visit the MacDill Field? Your husband works out there, does he not? A. Yes sir. Q. You had been in the Post Exchange there with your husband a good many times, have you not? A. Not very many. Q. Well, you have been there some haven't you? A. Yes sir. Q. You saw quite a number of colored boys working there, did you not? A. Yes sir. Q. Did you ever see this boy working there before? A. No sir. Q. Well, if it is established that he had a regular job there at the Post Exchange and that you have been going there with your husband, and that he was waiting on tables and doing things around there, then you would doubt about this being the same man, would you not? A. I was only out there one time after it happened and that was the Sunday that he passed by our table and I said that looks like the negro. Q. Mrs. Oakes, you are not certain that this is the negro boy that attacked you that night, are you? A. Yes sir, I am. Q. You are positive of that? A. I am positive. Q. You are sure that you could not be mistaken? A. No sir, I could not be. Q. Think about the condition and the situation there, it being a dark room that he came in when you saw him, and the situation and the circumstances. You know Mrs. Oakes that this is a case that is liable to result in this boy going to the electric chair, and you ought to be certain that he is the man? A. I am. Q. You are? A. Yes sir. Q. When was the last time you went to the Post Exchange before this happened? A. I don't know because I never did go out there unless maybe some Sunday afternoon maybe Charlie and I would ride out there, I would take him to work on Sunday morning, because I work and had no reason to go out there."

She identified her assailant subsequently at the Cass Street Bridge, and observed and commented to her husband about the similarity of the waiter (defendant) to her assailant when taking a meal with her husband at the restaurant where the defendant was employed a few days prior to his arrest. She later identified him at the police station. Her testimony is corroborated by officer Gray observing him at the Cass Street Bridge.

The officer testified viz:

"Q. Did you get a look at the negro that was about ten feet in front of the four? A. I got a very good look at him. Q. When? A. When I was in the tower. I say I got a good look because as he was approaching the tower, I don't know why, but he looked up like this as he was walking along several steps, and I was looking right down in his face. Q. What kind of lighting, if any, is there on the bridge there at that point. A. It is a pretty good light. There is several electric lights, which were lit up pretty well. Q. How far from a sidewalk where a man would walk was it from where you were in the tower? A. I would say approximately 15 feet, that is, just roughly guessing. Q. Could you give a general description of the negro you saw there at that time? A. Yes sir, I got an impression in my mind of the negro very good. Q. What was his general description? A. He was a negro around 5 foot, 8 or 9 inches tall, slender, I would call him brown skinned, and walked sort of quick like, is the description I give the other officers there after seeing this negro. Q. How was he dressed? A. He had on a brown hat and the hat was turned up all around and I would call it a dark green shirt, I noticed when he was walking away from me, that is a slipover sweater, not a shirt but a slipover sweater, and the back of it fit sort of like a coat in the back, and the sweater made his shoulders stand out erect as he was walking, and he walked sort of peppy, is the way I would describe his walk. Q. Did you see that person well enough to where you could identify him if you were to see him again? A. Oh, yes. Q. Did you identify him later? A. Yes sir. Q. Where? A. Over in the Police Station. Q. Who was it? A. This boy sitting here. Q. Can you say positively that this defendant sitting here is the one that you saw on the bridge that Wednesday night? A. Yes sir. . . ."

The appellant lived with his wife and her people at 1502 North B Street in the City of Tampa. It is near the scene on South Newport Street. The appellant, his wife, mother-in-law, sister-in-law and brother-in-law testified that on the evening of November 10, 1941, the appellant and wife were at home and planned to attend an Armistice Day dance the following night. He retired shortly after 11:00 o'clock and

the appellant as testified to by the several witnesses, was at home with his family when the alleged crime was committed. The evidence given by these witnesses placed the appellant at home with his wife and other members of the family when the crime was committed. The proof of an alibi is sufficient if it raises a reasonable doubt in the minds of the jury that the defendant was present at the time and place of the commission of the crime charged. See Dees v. State, 99 Fla. 1144, 128 So. 485. Proof of an alibi must be sufficient to raise a reasonable doubt of the accused's guilt in the mind of the jury. See Kines v. State, 121 Fla. 866, 164 So. 517. The accused, under the law, is not required to establish proof of an alibi beyond a reasonable doubt. See Blakes v. State, 133 Fla. 12, 182 So. 447.

The proof of an alibi depends on the credibility of the witnesses and the weight of the evidence and under our system the jury is the sole judge of whether the evidence raises or establishes a reasonable doubt. See Hamp v. State, 130 Fla. 801, 178 So. 833; Kines v. State, 121 Fla. 866, 164 So. 517; Caldwell v. State, 50 Fla. 4, 39 So. 188; Murphy v. State, 31 Fla. 166, 12 So. 453; Adams v. State, 28 Fla. 511, 10 So. 106. It is established that disputes and conflicts in the evidence are questions for a jury under appropriate instructions.

It is next contended that the victim was a matured married woman; the scene of the crime was one of 24 apartments situated in the center of Tampa; that the surrounding apartments were occupied at the time and had an alarm or signal of distress been given, protection immediately would have been given. A number of authorities have been cited. The State's answer to this is that the appellant placed a gun or knife on the victim's stomach and told her she would be killed if she gave an alarm or resisted and she was forced to submit to the desires of the appellant. It is the law that the consent to carnal intercourse obtained from a woman by fear of personal violence is void, and though a man lays no hands on a woman, yet if by an array of physical force he so overpowers her that she dares not resist, his intercourse with her is rape. See Doyle v. State, 39 Fla. 155, 22 So. 272; Rice v. State, 35 Fla. 236, 17 So. 286; Peterson v. State, 90 Fla. 361, 106 So.

75; Green v. State, 135 Fla. 17, 184 So. 504. The rule enunciated in Doyle v. State, *supra,* is approved by Wharton's Criminal Law, Vol. 1 (12th Ed.) par. 701, pp. 942-4, viz:

"701. Acquiescence Through Fear Not Consent:—Consent, however reluctant, negatives rape; but where the woman is insensible through fright, or where she ceases resistance under fear of death or other great harm (such fear being guaged by her own capacity), the consummated act is rape. Thus, where a father by his ferocity establishes 'a reign of terror' in his family, and under this power his daughter remains passive while he has carnal intercourse with her, this intercourse, effected by terror, and without consent, is rape. Nor is it necessary that there should be force enough to create 'reasonable apprehension of death.' But it is necessary to prove in such case that the defendant intended to complete his purpose in defiance of all resistance.

"It is admissible for the prosecution under this head to give evidence of the defendant's bodily strength, and of the prosecutrix's bodily weakness, but not that the prosecutrix knew of the defendant's bad character. While the degree of resistance is an incident by which consent can be determined, it is not in law necessary to show that the woman opposed all the resistance in her power, if her resistance was honest, and was the utmost, according to her lights, that she could offer."

It is contended that the identity of the assailant has not been established by satisfactory evidence, coupled with the failure on the part of the victim to resist as a matter of law entitles the appellant to an order of reversal. We cannot agree with these contentions. Where the verdict is supported by substantial evidence, it will not be set aside as against the testimony, unless it may well be assumed that the jury was improperly influenced by considerations outside the evidence. See Kirkland v. State, 93 Fla. 172, 111 So. 351; Howell v. State, 102 Fla. 612, 136 So. 456; Braxton v. State, 132 Fla. 815, 182 So. 276; Jones v. State, 134 So. 358.

The sixth question posed by counsel for adjudication is to the effect that the appellant was arrested without a warrant; not informed by the officers as to the charges under

which he was arrested and held: neither was he advised as to the effect and purpose of incriminating statements made, if any, and constitutional rights to him vouchsafed were totally disregarded by the officers. Section 901.15 Fla. Stats. 1941, provides for arrest by officers without warrant. Section 901.17, Fla. Stats. 1941, directs the arresting officer, without warrant, to inform the person to be arrested of his (officer's) authority, together with the cause of the arrest, except when the person to be arrested is engaged in the commission of an offense or is pursued· in the commission of an offense or is pursued after its commission or after escape flees or forcibly resists, etc. It is contended that the appellant was arrested and held without legal authority.

The record discloses that on November 11, 1941, Apartment No. 10 at 111 South Newport Street, Tampa, was unlawfully entered and a woman assaulted. The officers had a description of the assailant. The appellant answered the description. The arresting officers, from the description of the appellant, had reasonable grounds to believe that the appellant had assaulted the women in Apartment No. 10. Sub-section 901.15, Fla. Stats. 1941, authorizes the arrest by the officers as shown to have been made. Counsel contends it was the duty of the arresting officers under Section 901.17, Fla. Stats. 1941, to inform the person to be arrested, without warrant, the cause of his arrest. It is true that the officer did not at the moment of arrest advise as to the cause of arrest but did so subsequently. The appellant had escaped the officers at the Cass Street Bridge and fled from the scene. The officers acted within the law and rights of the appellant were not violated. See Robertson v. State, 43 Fla. 156, 29 So. 535, 52 L.R.A. 751; People v. Stein, 265 Mich. 610, 251 N.W. 788, 92 A.L.R. 481, and annotations at pages 490-501; 5 C.J. pp. 396 and 408; 6 C.J.S. 592; Agnello v. United States, 269 U. S. 20, 70 L. Ed. 145, 46 Sup. Ct. 4, 51 A.L.R. 409, and annotations.

Section 901.22 Fla. Stats. 1941, makes it the duty of an officer arresting a person without warrant, immediately and without unnecessary delay, to take the person so arrested before a magistrate having jurisdiction and make the com-

plaint authorized by law, and obtain a warrant for which the person was arrested. The person arrested shall have the right to an interview and advise of counsel. See Section 901.25, Fla. Stats. 1941. The victim identified the appellant as her assailant on the Cass Street Bridge around 7:30 P.M. on November 12, 1941. She saw him at the restaurant and identified him later at the Police Station. Officer Gray saw him at the Cass Street Bridge at 7:30 P. M. November 12, 1941, and identified him at the trial as the same man.

On March 31, 1942, in the neighborhood of the scene of the crime a man's shoe was found. A witness testified that he sold the shoe to the appellant. When taken into custody an officer gave the shoe to the appellant and asked him if it was his. He replied to the officer that the shoe was his and said he "had lost it." The shoe was admitted into evidence over objections of counsel and it is contended that this ruling constitutes reversible error. It is contended that the State's evidence fails to show that the appellant ever owned the shoe. Lawrence Carastra testified that he sold the appellant the shoe, and on cross examination admitted that if it was not the shoe he sold the appellant, it was one "just like it." The appellant admitted to the officer that it was his shoe. We fail to find error in this ruling. It is a deductible inference from the presence of the shoe in the neighborhood of the crime that the defendant on March 31, 1942 left the shoe where it was found, but if he did not its presence near the scene is explainable and its admission into evidence at the most is harmless error. See Section 54.23 General Statutes 1941 and 22 C.J.S. Subsection (c) of Section 713, p. 1217.

Counsel contend that appellant was deprived of constitutional rights by the officers when arresting him in that they handcuffed him and questioned him for 24 hours; carried him from Tampa to Clearwater over the night for safe keeping; took him from place to place exhibiting him handcuffed and chained; arrested or caused the arrest of his wife; false statements were made by an officer to the appellant about finger prints; these several acts and statements were designed to obtain a confession in derogation of rights vouchsafed by the Federal and State Constitutions.

It is settled law that when it is shown a confession was freely and voluntarily made and no improper influences were exerted or reward held out to obtain it, the confession is properly admitted into evidence. Likewise it is the law that if an alleged confession was not freely and voluntarily made, it is error to admit the same into evidence against the party making it. See Williams v. State, 143 Fla. 826, 197 So. 526; Clay v. State, 143 Fla. 204, 196 So. 462; Smith v. State, 135 Fla. 835, 186 So. 203; Cawthon v. State, 118 Fla. 394, 159 So. 366; Dabney v. State, 119 Fla. 341, 161 So. 380; Harrison v. State, 110 Fla. 420, 148 So. 882; Nickels v. State, 90 Fla. 659, 106 So. 479; Green v. State, 40 Fla. 191, 23 So. 851; McNish v. State, 47 Fla. 69, 36 So. 176; Sims v. State, 59 Fla. 38, 52 So. 198; Williams v. State, 48 Fla. 65, 37 So. 521; Moore v. State, 68 Fla. 91, 66 So. 431; McDonald v. State, 70 Fla. 250, 70 So. 24; Davis v. State, 90 Fla. 317, 105 So. 843; Chambers v. State, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568; Ziang Sung Wan v. United States, 266 U. S. 1, 45 S. Ct. 1, 69 L. Ed. 131; White v. Texas, 310 U. S. 530, 60 S. Ct. 1032, 84 L. Ed. 1342; Ward v. Texas, 316 U. S. 547, 62 S. Ct. 1139; 86 L. Ed. 1663.

The record discloses that the trial court, when objections were made, excused the jury and in its absence heard testimony on the questions as to the voluntariness of the challenged confession. The State and the defendant offered testimony *pro* and *con*. The appellant, two officers and a newspaper man went to 111 South Newport Street, and the appellant pointed out to them the place of intercourse, place where the bed was located, and the street traveled away from the scene. There was no force, coercion or duress exhibited and the appellant was in possession of his faculties when they accompanied him. He also pointed out to them the route of escape from the Cass Street Bridge. The appellant admitted that violence was not resorted to. The newspaper man and the two officers testified that the confession was voluntarily made, while the appellant testified *contra*. It was made to appear to the appellant that his finger prints had been obtained at the apartment, which was untrue. He made

the confession and pointed out the several objects within four hours after the arrest. The appellant repeated his confession to an assistant prosecuting attorney and his statements were taken by a reporter and transcribed. The record shows that the appellant was advised of his constitutional rights by the attorney before he was questioned. The reporter so testified and the trial court properly admitted into evidence the confession because it was voluntarily made.

The record fails to support the several contentions underlying the question posed for adjudication. The appellant made his confession within about four hours after his arrest and he was not questioned or harrassed for 24 hours as contended; the appellant was not chained and handcuffed but a chain was welded onto the cuffs; there is nothing in the record to sustain the contention as to mob violence; it is true that his wife was arrested but was immediately discharged; he was handcuffed while on tour of the scene of the crime and also the place and avenue of escape; the record fails to sustain the statement to the appellant that his finger prints were found in Apartment No. 10 at 111 South Newport Street.

We are not convinced that the appellant brought himself within the rule expressed in Ward v. Texas, *supra* (text 62 S. Ct. 1143), viz:

"This Court has set aside convictions based upon confessions extorted from ignorant persons who have been subjected to persistent and protracted questioning, or who have been threatened with mob violence, or who have been unlawfully held incommunicado without advice of friends or counsel, or who have been taken at night to lonely and isolated places for questioning. . . ."

We fail to find error in the record.

Affirmed.

TERRELL, THOMAS, ADAMS and SEBRING, JJ., concur.

BUFORD, C. J., dissents.

BROWN, J., dissents in part.

BROWN, J., dissenting:

Mr. Chief Justice BUFORD and this writer are of the opinion that the court below erred in admitting a certain shoe in evidence and the testimony with reference thereto. This shoe was found under a chair in the living room of a dwelling at 608 South Newport Street, in Tampa, on March 31, 1942. The crime involved in this case was committed on November 11, 1941 at 111 South Newport Street. The trial of this case was held early in June, 1942. The witness who testified at the trial that he sold a pair of shoes "just like this shoe," to the defendant, stated that he sold them to him "about four months ago;" that he could not be positive about the time of the sale but that to his best recollection it was after Christmas. So, according to the State's own witness, the defendant could not have owned these shoes at the time the crime was committed, but indicated that he might have owned them on the night of March 31, 1942, when the shoe in question was found at 608 South Newport Street. The lady living at that address stated that on that night she was awakened about 2 A. M. by her daughter speaking to her in a mumbling voice," and that it was then that she found the shoe under the chair. The offer to introduce this shoe in evidence and all the testimony connected with it was promptly objected to by defendant's counsel. I think this evidence was clearly inadmissible, in spite of the fact that there was some evidence tending to show that this defendant had possessed a shoe of this kind, and in all probability this very shoe. The State Attorney stated that this evidence was introduced for the purpose of establishing the identity of the defendant, which we admit was a question in the case. It is quite possible that it tended to establish the identity of the defendant as the man who purchased the shoe some two months after the crime here in question was committed, but we fail to see how this testimony was relevant to the identity of the person who committed the crime charged against this defendant back in November 1941. The general rule is that it is harmful error to admit evidence of other or collateral crime independent of and unconnected with the crime for which the defendant is on trial. There are certain exceptions

to this rule, but the admission of this evidence does not fall within any of those exceptions. Nickels v. State, 90 Fla. 659, 106 So. 479.

The question that has given me most concern in this case is whether or not the trial court erred in admitting the defendant's confession in evidence. On this record, this is a close question. Section 12 of our Declaration of Rights provides that no person shall in any criminal case be compelled to be a witness against himself. And as far back as the case of Simon, a slave v. State, 5 Fla. 285, this Court held that to render a confession admissible, it must have been freely and voluntarily made, uninfluenced by fear or hope. The opinion of Mr. Justice EEMMES in that case shows that such was the generally accepted rule in other jurisdictions at that time. And in another of our early cases Coffee v. State, 25 Fla. 501, 6 So. 493, this Court held that confessions of persons charged with crime should be acted upon by courts and juries with great caution: that before being admitted it must first be clearly shown that such confessions were free and voluntary, and that when a confession has in the first place been made under illegal influences, such influences will be presumed to continue and color subsequent confessions unless the contrary is clearly shown. This rule against compulsory self-incrimination is extremely important and should be jealously preserved and fearlessly applied.

In a long line of cases, as shown by the opinion of Mr. Justice CHAPMAN, this Court has held that a confession should not be admitted in evidence unless it is made to appear to the trial court that it was freely and voluntarily made, uninfluenced by fear or the use of force, threats or intimidation of any kind, or induced by any promises, hope of reward, or other illegal inducements. The true test is whether or not the confession was in fact freely and voluntarily made. We have also held that a confession may be free and voluntary even when made by the defendant to an officer while under arrest and in custody, and even where the defendant had not been informed of his constitutional right not to testify against himself and that, if he does, anything that he might say might be used against him,

though in such cases the question as to whether or not the confession was in fact free and voluntary should be more stringently examined into by by the courts and the slightest evidence of threats or inducements may under such circumstances suffice to exclude the confession. See Louette, et al., v. State, decided at the present term and not yet reported.

The arrest without a warrant in this case was we think a valid arrest under Section 901.15, Florida Statutes of 1941, which provides that when a felony has in fact been committed and an officer has reasonable ground to believe that the person arrested has committed it, an arrest without warrant may be made. However, I think that in this case the arresting officers violated both Section 901.17 and 901.23 Fla. States., 1941. In this case the arresting officers, upon request of the defendant, refused to tell him what he was being arrested for, as it was their duty to do, even without such request, under this statute. (Section 901.17, *supra*). It is true there are certain exceptions stated in the statute, but in my judgment this case does not fall within any of those exceptions. Nor did the officers comply with said Section 901.23, which provides that when an officer arrests a person without a warrant, he shall without unnecessary delay take the person arersted before the nearest or most accessible magistrate within the county in which the arrest occurs, having jurisdiction, and shall make before the magistrate a complaint, which shall set forth the facts showing the offense for which the person was arrested. However, the failure to comply with the statutes referred to would not necessarily render a free and voluntary confession inadmissible in evidence. But these are some of the circumstances to be considered in determining whether the confession was in fact a voluntary one.

There are also other circumstances in this case which no doubt gave the trial court, as well as this Court, considerable concern. For instance, when this defendant was arrested, he was handcuffed and lead around by a chain attached to the handcuffs. In this handcuffed condition, and during that same afternoon, he was taken to various places, including the apartment at 111 South Newport Street, in

Hyde Park where this crime was committed. It appears from the testimony of the officers that when taken there, he not only confessed his guilt, but also volunteered the statement that the bed in the room where the crime was committed had been moved to a different part of the room from that in which it was located on the night of the crime.

It is also shown by the testimony of one of the officers that during at least a part of that same afternoon the defendant appeared to be frightened; that he was not afraid of the officers, who had not mistreated him, but he was afraid "of the public." However, there is no evidence in this record that there has been any threat of mob violence. Defendant was arrested about three o'clock in the afternoon, some five months after the crime was committed, was taken to police headquarters and finger printed. He was questioned by the officers on several occasions during the afternoon and evening, and was taken by the officers over to Clearwater, the county seat of the adjoining county, and placed in jail there for the night. No explanation of this procedure is disclosed by the record, but it may have been resorted to as a safeguard against possible mob violence, and was calculated to so impress the accused, though the testimony does not show that he was so impressed.

From the time of his arrest until his examination by the assistant State attorney, he had not had any contact or consultation with his family or friends, nor any advice of counsel. Nor does it appear that he had made any request for such consultation or advice. It also appears that over defendant's protest, on the afternoon of his arrest, the officers sent out to his home and "picked up" his wife and brought her to the police station for questioning about the shoe, but defendant was given no opportunity to meet or talk with her. So it might be inferred that the accused was held incommunicado.

He was brought back to Tampa from Clearwater the next morning and some time during the day the assistant State Attorney, in the presence of two of the arresting officers, took his confession by asking him questions, the questions and answers being taken down by the court reporter.

Before asking the defendant any questions, the Assistant State Attorney told him the nature of the charge against him and gave him full information as to his constitutional rights; told him that he did not have to answer any questions that would incriminate him unless he wanted to, and warned him that anything he might say could be used against him in court. The court reported testified that the defendant appeared to be perfectly calm and self possessed throughout this examination, and readily answered the questions propounded. Indeed, the evidence is convincing to the effect that at no time was any form of force used, unless the handcuffing of the defendant, which officers testified was usual in making all arrests for serious offenses, might be deemed to be a use of force; nor does the record (except the testimony of the defendant) show that any threats were made at any time, or any form of intimidation or coercion resorted to, or that any promises were made or inducements offered. The only thing which could possibly be considered as an inducement was that one of the officers told defendant that the best thing for him to do was to tell the truth. Nor does it appear that any long-drawn-out, persistent and oft repeated questioning, such as would tend to break down the will or resistance of the defendants, was resorted to. These facts differentiate this case from the case of Chambers v. State, 309 U. S. 227, 84 L. Ed. 116, and several other decisions of the United States Supreme Court, cited in the opinions of Mr. Justice CHAPMAN and Mr. Chief Justice BUFORD.

It is true that the defendant in this case was a young negro man barely twenty years of age, who had very little education, but his testimony as shown by the record indicates that he was quite intelligent. It is also true that a ruse was resorted to by the finger print officer, who led him to believe that a finger print which he showed him which had been found in a house in Hyde Park, the section of the City where the crime was committed, tallied with the defendant's finger prints. And then the finger print officer, seeing that the defendant was very much impressed, asked him if he would not like to talk to the Chief of Police and tell him all that he knew, to which suggestion the defendant appeared to con-

sent, whereupon he was taken into the Chief's office, and there, at that time, or later on in the afternoon, in the presence of the Chief of Police and several others, confessed his guilt.

We have held that a confession is not rendered inadmissible because it was induced by some mere artifice, falsehood or deception practiced by the officer if it appears that it was nevertheless freely and voluntarily made. See Harrison v. State, 110 Fla. 420, 148 So. 882, and cases cited. But if a confession is obtained by fraud, collusion, trickery and subordination of perjury on the part of those representing the State, it should not be admitted. Lisenba v. Cal., 314 U. S. 219, 86 L. Ed., 166.

In keeping with the previous decisions of this Court, the trial court, before admitting the confession, sent the jury out and conducted an exhaustive inquiry into all circumstances attending the making of the incriminatory statements and confessions by this defendant. The duty rested upon the trial court to determine, from the evidence introduced both by the State and the defendant, in the absence of the jury, whether or not the confession offered by the State was in fact freely and voluntarily made. After going into the matter fully, the trial judge decided that the confession was freely and voluntarily made and stated that he would admit the same in evidence. Then the jury was brought in, and all the testimony which had been offered by either side in connection with the confession was re-testified to before the jury.

This Court has held that the trial court is necessarily vested with a large discretion in determining this question of the admissibility of a confession; that it is a discretion that should be exercised with great care, to the end that true and proper enforcement of the law be not impeded, on the one hand, and that no injury be done the defendant on the other; and that after a confession has been admitted the defendant is entitled to have the evidence in regard to the manner in which it was obtained given anew to the jury, not that the jury may pass upon its admissibility, but for the purpose of enabling them to judge what weight and value should be given to it as evidence, and that upon his request the de-

fendant is entitled to an instruction on that point. Bates v. State, 78 Fla. 672, 84 So. 373; Nickels v. State, 90 Fla. 659, 106 So. 479; Harrison v. State, *supra;* Brown v. State, 135 Fla. 30, 184 So. 518. These cases point out that in the determination of this question of admissibility, the trial court frequently has to act upon conflicting testimony and that the determination of this question of mixed law and fact by the trial judge comes to this Court with a presumption in favor of the correctness of his ruling. This is necessarily a correct rule of appellate review, because the trial judge has an opportunity, not possessed by the appellate court, to observe the demeanor of the witnesses on the stand, the candor or lack of candor of the witnesses and the weight and credibility of their testimony. For these reasons the appellate court should not set aside a ruling by the trial court, either admitting or denying the admission of a confession, unless the evidence as shown by the record clearly manifests that the trial court was in error. Nickels v. State, *supra.*

In considering this question this writer has given careful consideration, not only to our own former decisions, but also to the decisions of the Supreme Court of the United States, including the Chambers case, 309 U.S. 227, 84 L.Ed. 716; White v. Texas, 310 U.S. 530, 84 L.Ed. 1342; Ward v. State of Texas, 316 U.S. 547, 62 S.C. 1139, 86 L.Ed. 1663, Brown v. Miss., 297 U.S. 278, 56 S.C. 461, 80 L.Ed. 682, and Lisenba v. Cal., 314 U.S. 219-243, 86 L.Ed. 166. It appears from the Federal decisions that the principles which the Supreme Court of the United States has laid down, in cases coming up from the State courts where the admissibility of confessions was reviewed under the due process clause of the Federal Constitution, are practically the same principles as those which this Court has enunciated throughout the years, although in one case, the Chambers case, supra, the United States Court held that this Court had not properly applied those principles to the facts of that case.

After carefully reading this record, I am not clearly convinced that the trial court was in error in admitting the confession of the appellant.

But for the reasons herein above pointed out, I do think

that a reversible error was committed in admitting the evidence with regard to the shoe. I therefore concur with Mr. Chief Justice BUFORD that the judgment below should, for that reason, be reversed for a new trial.

BUFORD, C. J., concurs.