DREW, Justice
(dissenting).
Accepting as correct the justifiable conclusion of the majority that the confession of the defendant introduced in evidence was freely and voluntarily given and accepting as true every statement made by the defendant in that confession and the testimony of the prosecuting witness, the sum of such evidence is, in my opinion, legally insufficient to establish the guilt of the defendant of the crime of rape under the statutes of this State and the numerous decisions of this Court on the subject. The essential element of force is wholly lacking.[1] There is not even any contention of physical force being asserted, the prosecution resting its case upon the theory that the prosecuting witness here submitted to the acts of the defendant because her ability to resist was over-powered by fear. It is my view that an analysis of the evidence, which regrettably it is necessary to quote at length, does not establish beyond a reasonable doubt — as it must in order to sustain this conviction- — that the assault by the defendant upon the prosecutrix was by force and against her will.[2]
After reviewing all of the evidence in the record as we are required to do in capital cases,[3] I am firmly of the view that the ends of justice require a new trial. The evidence is so inconclusive and lacking in proof of many of the essential elements of the crime charged that it is legally insufficient to support the verdict and judgment rendered and the sentence of death in the electric chair imposed thereon.
In the recent case of Callaway v. State, 109 So.2d 364, 367, we quoted with approval an excerpt from the case of Ex parte Milligan, 4 Wall. 2, text 118, 18 L.Ed. 281, which it is appropriate to repeat here:
“ ‘No graver question was ever considered by this court, nor one which more nearly concerns the rights of the whole people; for it is in the birthright of every American citizen when charged with crime, to be tried and punished according to law. The power of punishment is, alone through the means which the laws have provided for that purpose, and if they are ineffectual, there is an immunity from punishment, no matter how great an offender the individual may be, or how much his crimes may have shocked the sense of justice of the country, or endangered its safety. By the protection of the law, human rights are secured; withdraw that protection, and *391 they are at the mercy of wicked rulers, or the clamor of an excited people.’ ”
The prosecuting witness in this case is a woman 47 years old. She was a native of West Virginia, had been married three times, and was the mother of two children. On the afternoon of the day of the commission of the crime she and her husband had spent the afternoon fishing and had returned to their home in a well built up section of the City of Clearwater. Her daughter and grandson of the age of three years resided with them. The house in which they lived had three bedrooms, a living room, dining room, kitchen and bath. The three bedrooms were along one side of the house with the living room, dining room and kitchen on the other side and a bathroom in the rear of the building. The front bedroom had an entrance from the living room. To enter the second bedroom from the front bedroom it was necessary to go into the living room, walk a few steps and into the second bedroom. There was no door between the bedrooms. The prosecutrix testified that she and her husband retired between 9 and 10 o’clock in the front bedroom but that later during the very warm evening she took her grandson of three years and retired to the second bedroom where they occupied the same double bed. She testified that shortly after they retired to the second bedroom she heard a door slam and not knowing which door it was, “yelled for my daughter thinking it was her coming in. I yelled for my husband and he did not answer. I thought it funny they did not answer me and I kept yelling for them and neither one answered me.” (Emphasis added.) She was asked on direct examination with reference to her use of the word “yelling”:
“Q. Just calling their names? A. That is right.
“Q. Were you calling them in your regular tone of voice? A. I yelled.”
She then stated that some one stepped in the door of her bedroom with a hood over his head and said “keep quiet.” She stated that he wore gloves and a coat or jacket. She was asked “after this person said keep quiet, what did you do ?”, and she answered “I kept yelling and he said, ‘Keep quiet or I will shoot you.’, and I guess I kept on. He said, T mean what I say. Shut up and keep quiet.’ ” (Emphasis added.)
In order that the events which subsequently transpired may be viewed in the light of surrounding conditions and circumstances, and accepting the confession of the defendant introduced in evidence by the State as having been freely and voluntarily made and as correctly stating the facts which ^transpired, the accused entered this house through the front door which led into the living room which had a dim light on at the time; he first went into the front bedroom and there saw the husband lying on the bed; he started to go through his pants pockets but the husband turned over and he did not pursue his search further. He then left the husband’s room, walked to the rear of the house where he found a pocketboolc, then returned to the second bedroom where the prosecutrix was lying on the bed with the grandson. It is, therefore, quite clear from the record that during all of the events which transpired after the accused entered the bedroom of the prosecutrix, he had full knowledge that the husband of this woman was lying on the bed in a bedroom only a few feet away.
We now revert to the prosecutrix’ testimony as to what happened after he told her to keep quiet or he would shoot her. The following are direct quotes from the prosecutrix’ testimony (all emphasis is added):
“A. I said, ‘What do you want’. I said, ‘Please don’t hurt the baby’, and he said, ‘If you will keep quiet and shut up and do what I tell you I won’t hurt you.’ I said, ‘What do you want’ and he said, ‘You, and get yourself ready’.
“Q. What happened then? A. He pulled me over on the side of the bed *392 and pulled my gown up and got on top of me.
“Q. Go on. A. And he had trouble so he removed one of his gloves and laid it on the floor.
“Q. What trouble was he having? A. He could not seem to get it in.
"Q. He was attempting to have sexual intercourse with you at that time? A. Yes.
“Q. After he removed his glove, what did he do? A. He forced his way in.
“Q. Was there a complete penetration, Mrs. Cothrell? A. Yes.
“Q. What happened then? A. There was only about, it seemed like ten or fifteen minutes.
“The Court: Say that again, please. A. About ten or fifteen minutes it seemed like.
“Q. That he was having intercourse with you? A. Yes.
“Q. And then what happened? A. He kept saying, ‘Don’t tell this to anyone’.
“Q. Was he saying anything to you during the time he was having intercourse? A. No.
“Q. Were you doing anything at that time? A. No.
“Q. All right. After the ten or fifteen minutes had expired, what did he do? A. He got up and left and he said, ‘Don’t report this to anyone or I will kill you’.
“Q. Did you believe him? A. I did because I was scared.
“Q. All right, Mrs. Cothrell, what happened to this person at that time? A. He left I suppose because I sat on the bed it’seemed like ten minutes before I moved. I was afraid to leave the room and walk through, I was afraid he would be on the outside. And finally I went to the bathroom and sat down screaming and going on. I did not know what to do — to start to the front bedroom — or what. I was scared he would be on the outside and kill me as I went through. When my daughter came in I was sitting on the side of the bed in the front bedroom screaming and going on.”
The witness then testified, among other things not important to relate here, that the defendant was 5'6" or 5'8" in height and weighed ISO to 175 pounds. Her height and weight are not shown in the record.
“Q. Mrs. Cothrell, when this person had you pinned to the bed where were his hands or arms? A. On the bed I guess.
“Q. You do not recall? A. His right hand was on the bed.
“Q. Why was it, Mrs. Cothrell, that you did not continue to shout or call for help? A. I was frightened.
“Q. Did he say anything to you at the beginning other than what you testified to, that is, that don’t shout or he would kill you? Do you recall anything else he might have said? A. Just don’t tell this to anyone and keep quiet and do what I say.”
During the whole period testified to the small child was lying on the bed where the act was committed, the husband in the adjacent room; neither was disturbed nor awakened. The above was the State’s testimony on direct examination. On cross-examination it was brought out that the house in which this offense was committed was located quite close to other houses in the neighborhood and the shades in the bedroom were up and that at all ’ times during the evening there was a dim light on in the living room and that the door of the bedroom in which the husband was sleeping was open as was the door of the *393 bedroom in which the prosecutrix and the grandson had retired. We now quote from the testimony of the prosecutrix on cross-examination, picking up the events at the time the defendant first appeared in the door of the prosecutrix’ bedroom.
“Q Did he have a gun in his hand? A. I did not see no gun.
“Q. Did you see anything in his hands? A. No.
“Q. You did not scream for your husband? Right at that stage when this fellow with the hood stood in the door? A. Yes, I screamed for him and my daughter too.
“Q. You screamed real loud at that stage? A. Yes.
“Q. And that is when he made his next statement, to the effect, ‘Keep quiet, or I will kill you’? A. Yes. He said, ‘Shut up, keep quiet, or I will shoot you’, and he reached like he was going to get a gun out of his pocket.
“Q. He had a brown coat on? A. Yes, a jacket of some sort. It looked brown standing in the door. It looked like army clothes.
“Q. Did he say, ‘Keep quiet or I will shoot you’, did he say it in a loud voice, will you describe the manner? A. He did not say it too loud, but loud enough.
* jfc sH ‡ % %
“Q. And he paid no attention to the fact there was a door and a window open, he did not go over there and close it? A. No.
“Q. And he told you to get down on the bed ? A. He told me he wanted me, to get myself ready.
“Q. When he said that, did he make any threatening gestures, did he pull out a gun or knife or raise his hands? A. I did not see any.
“Q. Did he ever slap you across the face about this time? A. No.
“Q. He just said, ‘Make yourself ready and get in bed’, and you went over to the bed and did you lay back or did he push you back? A. I was already on the bed.
“Q. When he made that statement? A. Yes.
“Q. You were sitting up ? A. Yes.
“Q. In fact you were sitting on the edge of the bed when he first appeared in the doorway? A. I raised up.
“Q. You never got off the bed at any time? A. No.
* * * * * Hi
“Q. And that is the only part of him you had seen up to that time, is that correct? Mrs. Cothrell, you understand, and I am sure the Judge and the Jury does that the questions I am going to ask now is not done with any intent to embarrass you at all. I am just trying to get the facts of the case as the Court and Jury are. This man made one statement, T want you to get yourself ready’ or words to that effect. Is that what you said? A. I do not understand you.
“Q. This assailant or man standing in the doorway there as you testified at first he said words to the effect, ‘Keep quiet or I will shoot you’. A. Yes.
“Q. That is the first thing he said. Then he said when you asked him, ‘What do you want here’, then he told you, T want you. Make yourself ready.’ Is that your testimony? A. He said, ‘I want you and get yourself ready’.
“Q. At this time you were seated on the bed? A. Yes.
“Q. When he said that, what gestures, did he threaten you in any way when he said that? A. Other than just, ‘Keep quiet’.
“Q. He did not exhibit a knife.? A. I did not see no knife.
*394 “Q. tie did not have a gun or club or anything like that? A. I did not see it.
“Q. Did he clench his fist? A. Not as I know of.
“Q. Up to this point, had he actually ever contacted you physically by laying his hand on you or twisting your arm or anything like that?
“The Court: Mr. Allbritton, hasn’t she gone over that thing several times. Is it necessary to go over it again. She has gone over the story two or three times, the same thing.
“Mr. Allbritton: It is our contention this is coming down to the essential part of this case and I would like to have the opportunity to supply it.
“The Court: You have supplied it two or three times. I want you to get all the facts out of it but I do not want you to go over it again. If you have any more facts to ask her do so, but do not go over the same ground.
“Q. When you laid back on the bed did he push you down? A. He pushed me down and pulled my gown up.
“Q. He did all that? A. Yes.
“Q. Had he removed any of his clothing prior to doing this? A. Nothing other than his glove.
“Q. His right glove? A. His left glove.
“Q. This act you say took approximately ten or fifteen minutes. A. It seemed that long.
“Q. At any time when he was actually in the act with you did he have his hand on your throat? Or was he causing any other— A. No. He did not have his hand on my throat. He had one hand on the bed and the other to get his way in me. He forced his way in me and laid his weight on top of me.
“Q. After he was through he got up. Did he make any statements to you? A. Not to tell anyone or report it.
“Q. What did he do with the glove he had taken off? A. I suppose he took it with him.
“Q. You do not recall him putting it back on? A. No.
“Q. Then he went out the doorway, the same door he came in? A. I do not know whether he did or not. I do not know which way he went out.
“Q. Were you watching him at that time? A. No, I was not. I was just frantic. I was scared so I did not know what to do. I was just there on the bed.”
* * * * * *
“Q. I believe you stated after this act took place and this assailant left the first person you talked to was your daughter that just came in? A. Yes.
“How long was it after this man left before your daughter came in? A. She came in at two o’clock.
“Q. In relation to when this man left you or left the room? A. I would say about twenty minutes. Or something like that.
“Q. During all that time you stayed right there on the bed? A. No, I went to the bathroom and from the bathroom to the front bedroom.
“Q. You went to the bathroom before going to the front bedroom where your husband was ? A. Yes, sir.
“Q. After you got out of the bathroom you went to your husband’s room? A. Yes, sir.
“Q. Did you wake him up at that time? A. I tried to wake him up. I was trying to get him awake when my daughter came in. I was screaming and going on and crying.
*395 “By the Court:
“Q. Say that again? Please? Speak a little louder. A. I was trying to get him awake when my daughter came in.
“Q. Did you have difficulty waking your husband? A. Yes, he is hard to wake. I was there trying to get him awake and I was screaming and crying and she came in at the time and she wanted to know what was wrong and I told her. She got him up and he got dressed and went outside with the flashlight and could not see anyone so he called the police.”
It is a well established principle of law that consent of the woman from fear of personal violence is void, and though a man lays no hands on a woman yet if by array of physical force he so overpowers her that she dares not resist, his carnal intercourse with her is rape. The cases are legion in which this principle is pronounced.[4] The question, however, of the application of that principle to a factual situation is quite another matter. If, in fact, the power of the woman to resist is overcome by fear of great bodily harm, there can be no doubt that her consent is void. The difficulty that arises is in determining whether there is a sufficient exhibition of force or that the fear induced by circumstances is reasonably sufficient to render void the consent of the woman. And this problem has vexed the courts on many occasions. What may induce such overpowering fear in one woman may not have the same effect upon another. Moreover, in the vast majority of cases where convictions have been upheld in cases of this kind, such fear has been induced through beatings, exhibitions of or threats with deadly weapons or other physical harm to the woman involved. In this case the whole point at issue is whether the prose-cutrix under the circumstances related by this record was so overcome by fear that it destroyed her power of resistance. In considering this proposition it is perfectly appropriate to observe that this prosecutrix was a woman forty-seven years of age who had been married on three occasions and had two children. She knew what was involved in and the consequences of such an act. She knew at the time that her husband was sleeping in a room only a few feet away and that any determined resistance or outcry would possibly be heard by neighbors who were living in the immediate vicinity. Moreover, the record is plain that this defendant neither exhibited nor threatened this prosecutrix with a knife, gun or other deadly weapon. The only threats were his presence and his utterances. She surely knew that by the exercise of some resistance she could gain time to prevent this act and obtain help.
In the case of Hollis v. State, 27 Fla. 387, 9 So. 67, 69, decided by this Court in 1891, the female involved was a girl fourteen years of age who alleged that the defendant forcibly and against her will had intercourse with her and that she did not resist him because she was overpowered with fear for her safety. The assault took place in a residence in an isolated section of orange grove but this Court reversed the conviction, among other things, making the following pertinent observation:
“ * * * All that we have proven up to the point of her being thrown down is that it was done in the manner stated, but without any opposition or resistance on her part. When she has been put down, we find that he threatened he would kill her if she hallooed. True it is that the threat is evidence tending to prove his purpose to consummate the carnal knowledge against her will, but it is not of itself evidence that she was making any resistance of any kind to his efforts. Up to this time she had made none, and she is not shown to have made any *396 afterwards. Pressing his arm upon her throat, as he did when he removed his hand from her mouth, which he must have done to so locate his arm, an act which the jury justly may have inferred, was done to prevent her making an outcry; still there was no resistance with her body or any member of it. No adjudication or other authority, nor common sense applied to the nature of a virtuous woman, authorize us to hold that this testimony could support a verdict under either of the two views maintained by the authorities as to the extent to which there must be resistance where the prosecutrix was of mature years. It cannot be assumed of any mature woman that her submission to carnal connection under such circumstances is against her will, in the absence of affirmative proof of such a mental or physical condition as would naturally and reasonably overcome her powers of resistance. On the contrary the only natural and reasonable conclusion in such a case would be that it was really, if not seemingly, with her consent. Though this be so, is it, in view of the authorities, the law that, considering the age of this prosecu-trix, the testimony was sufficient to justify the jury in believing, beyond a reasonable doubt, that the consummation was against her will?” (Emphasis supplied.)
The State has the burden of establishing beyond a reasonable doubt that the mind of this woman was so paralyzed and overpowered by fear that any consent which ensued was void.[5]
It is true, of course, that the jury in these cases is the sole judge of the credibility of the witnesses and of the weight of the evidence. It is equally true, however, that the courts have the power and the profound duty to determine whether such evidence is sufficient under the law to sustain the judgment of conviction. This is a particularly solemn and sacred duty in reviewing cases where the ultimate punishment has been imposed. Mistakes may not be corrected after the judgment has been executed. It has then passed beyond correction by mortals.
In cases of this kind the courts have long recognized that a judgment of guilt may be lawfully rendered on the uncorroborated testimony of the prosecutrix.[6] The immediate outcry of the prosecutrix and the disclosure by her of the events at the earliest possible moment is highly indicative of the truthfulness of her statements and has been accepted by courts as competent evidence to substantiate and support the charges made by her.[7] In this case, however, it is highly significant that neither the husband nor the daughter to whom the outcry was made were produced as witnesses at the trial. The failure of the State to produce these parties to testify as to the alleged hysterical condition of this prosecutrix some twenty minutes after the occurrence of this assault must be taken as evidence of the fact that such testimony would not have been favorable to the prosecution. This principle of evidence is firmly embedded in both the civil and criminal law.
“It is well settled that if a party fails to produce the testimony of an available witness on a material issue in the cause, it may be inferred that his testimony, if presented, would be adverse to the party who fails to call the witness. This rule is supported, of course, by the cases adhering to the general rule which permits the jury to draw unfavorable inferences from the failure of a party to produce evi *397 dence which is properly a part of his case and within his control.” 20 Am. Jur., Evidence, Sec. 187, p. 192.
The only exception to the rule above quoted is in those instances where the testimony of the uncalled witness would have been merely cumulative or corroborative.[8] It is highly significant, however, in the consideration of the matter now before us that the testimony of the prosecutrix with respect to these events, and particularly to her physical and mental condition immediately following the events, is uncorroborated. The only witnesses who were in a position to advise the trial court and jury as to the condition of the prosecutrix in this respect immediately after this affair were the husband and the daughter, neither of whom were produced. Nor is there any explanation in this record from the prosecutrix or any other witness or the prosecuting officers to explain the absence of these material witnesses from the stand. It is, therefore, lawful and proper to infer that their evidence would not have been favorable to the prosecutrix. If the evidence then would not have been favorable to the prosecutrix, how can it be logically ■contended that the State has carried its burden of proving the essential elements of the crime of rape beyond and to the ■exclusion of reasonable doubt.[9]
Having reached the conclusion that the •evidence in this case is wholly insufficient as a matter of law to support the verdict and judgment rendered against this defendant, and being of the further view that the ends of justice in this cause require a new trial, 1 most respectfully dissent from the opinion affirming the judgment and sentence of death.

. “Whoever ravishes and carnally knows a female * * * T)y force and agaAnst her will * * * shall be punished * * (e. s.) Sec. 794.01, Florida Statutes, F.S.A. Russell v. State, 71 Fla. 236, 71 So. 27; Bailey v. State, 76 Fla. 213, 79 So. 730.

. “In a case of this kind where no other person was an immediate witness to the alleged act the testimony of the prose-cutrix should be rigidly scrutinized, especially as to the nature and extent of the force used and as to whether consent was not ultimately yielded, and before you can convict the accused you must be satisfied beyond a reasonable doubt that the alleged rape was ‘forcible and against the will of’ the prose-cutrix, since the accomplishment of the act by force and against the will of the female are the essential elements of the crime.” Christie v. State, 94 Fla. 469, 114 So. 450, 451.

.Section 924.32, Florida Statutes, F.S.A.: “(2) * * * Upon an appeal from the judgment by a defendant who has been sentenced to death the appellate court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is a ground of appeal or not.”

. Flowers v. State, 152 Fla. 649, 12 So.2d 772; Green v. State, 135 Fla. 17, 184 So. 504; Thomas v. State, Fla., 92 So.2d 621.

. Ibid.

. Doyle v. State, 39 Fla. 155, 22 So. 272; Ex parte Tully, 70 Fla. 1, 66 So. 296.

.Annotation 60 A.L.K.. 1141.

. See Annotation, 135 A.D.R., beginning at page 1376.

. Evidence of immediate outcry, and the physical or emotional condition of victims of this crime, is highly pertinent to corroborate the testimony of the victim, on which, more often than not, the fate of the defendant bangs, and wbieb in many, if not most, instances, by the very nature of the offense, is otherwise uncorroborated. Irvin v. State, Fla., 66 So.2d 288; Manning v. State, Fla., 93 So.2d 716; Annotation, note 7, supra, 60 A.L.R. at page 1148.